T. D. FENDER, Appellant, v T. GENE PRESCOTT, Respondent, et al., Defendant.

T. D. FENDER, Appellant-Respondent, v T. GENE PRESCOTT, Respondent-Appellant.

First Department, May 17, 1984

APPEARANCES OF COUNSEL

*Arthur Kokot* of counsel (*Kay Collyer & Boose,* attorneys), for T. Gene Prescott.

*James J. Terry* of counsel (*Robert E. Kushner* with him on the brief), in the first above-entitled action; *Edward N. Meyer* of counsel (*David B. Newman* and *Robert E. Kushner* with him on the brief), in the second above-entitled action (*Cole & Deitz,* attorneys), for T. D. Fender.

KASSAL, J.

The parties are equal shareholders, officers and directors of National Cold Storage Co., Inc. (National), engaged in purchasing and operating cold storage warehouse facilities, primarily in the New York-New Jersey metropolitan area. Prescott resides here and Fender in Florida. The two principals functioned well, at least initially, both in the operation of the business and in the pursuit of corporate opportunities. While Prescott claims that National was to be involved solely in the cold storage warehouse business, Fender argues that the parties considered the acquisition of other unrelated opportunities, including an insurance company in South Carolina, waterfront property in New Jersey, oil and gas properties in Tennessee, a five-story warehouse in New York and a cold storage and trucking operation in New Jersey. There is a dispute as to whether the various business opportunities were to be pursued for their individual benefit or as possible acquisitions for National. Fender, while admitting that the two did have separate and independent business interests, claims that whatever opportunities he had offered to Prescott were considered by him as potential deals for National and he assumed that Prescott acted in similar fashion. He points to Prescott having forwarded to him financial information concerning a "park and ride" business in Atlanta, Georgia, and a corporation which manufactured waterproof footwear and meteorological balloons and then soliciting Fender's opinion as to the acquisition of these corporate opportunities for National.

In June of 1980, Fender learned that National Gypsum Company was considering divesting itself of its Gold Bond Division, engaged in the manufacture of asbestos building products in New Orleans, Louisiana. Fender claims that although Prescott questioned the advisability of the investment because of the potential liability involved in dealing with asbestos products, he never objected to the venture as not being within the scope of National's business nor did he evince any intention on his part to acquire the asbestos plant solely for himself. In March, 1981, Fender learned that Prescott formed a separate corpora-

tion, International Building Products, Inc., to acquire the Gold Bond Division and, it is alleged, used $14,200 of National's funds to investigate the acquisition and borrowed $700,000 from National to complete the deal. Prescott claims that he told Fender in October in 1981, six months prior to the acquisition, that he would not enter into the deal with Fender and that Fender could have it for himself. Fender, on the other hand, asserts that he told Prescott that the acquisition was for National; he had no desire to enter into the deal on his own; and Prescott never said he would acquire the asbestos plant himself.

It appears from the record that the dispute concerning the asbestos plant was the last straw in an otherwise deteriorating relationship between the two principals, who entered into a buy-sell agreement on June 9, 1981. Under its terms, either party could offer to buy out the other, and, thereupon, the offeree had the option to elect to be either the purchaser or the seller in accordance with the terms of the offer. The agreement further provided for a closing within 30 days, with an option by the purchaser to a 90-day extension. It included an indemnity clause by which the purchaser agreed to hold the seller harmless against any claim or loss with respect to "vested unfunded pension fund liabilities and tax liabilities arising after the closing in connection with any company or entity that is a part of the National Properties."

On June 15, 1981, Prescott offered to purchase Fender's interest under the buy-out agreement at a base price of $1,400,000, less any indebtedness of the seller. However, within the 15-day period provided for, Fender exercised the option to purchase Prescott's 50% interest by letter dated June 25, 1981, further extending the closing for an additional 90 days. On October 13, 1981, Fender confirmed in writing his election to purchase defendant's interest and stated that he would arrive in New York on October 19, with the closing to take place on the afternoon of October 19 or at any time during October 20, 1981, at the office of defendant's attorneys, to whom a copy of the letter was directed. On October 16, 1981, plaintiff's counsel contacted Arthur Kokot, a member of the law firm which represented defendant, to inform him that Fender would attend the closing at Kokot's office on October 19 or 20.

Fender arrived in New York on October 19 and met directly with Prescott. Prescott conceded in his examination before trial that plaintiff advised that he was ready to close and that he had a check representing the purchase price, contrary to the claim on this appeal that Fender made no mention of any closing. It further appears that plaintiff's attorney contacted Kokot on October 19 to confirm that the closing would take place the next day, at 3:00 P.M. at Kokot's office. On October 20, 1981, plaintiff's attorneys hand-delivered a letter to Prescott's attorneys, confirming that the closing would take place as scheduled at 3:00 P.M. that afternoon at the office of defendant's attorneys and requesting that if Prescott did not intend to close to have counsel so advise. Kokot received the letter at about 11:25 A.M., the same time the letter was delivered to Prescott's office in New Jersey, albeit Prescott claims he did not see the letter until he arrived in the office after 3:00 P.M.

Fender and his attorney arrived at Kokot's office for the closing at 3:00 P.M. with a cashier's check, drawn on a Florida bank, in the sum of $700,000, the net purchase price, after deducting Prescott's indebtedness to National, whereupon Kokot, for the first time, advised that he had no authority to act on defendant's behalf, in spite of the fact that his law firm had represented Prescott for some time and had done so on the contract. He raised no objection as to the sufficiency of notice of the closing nor did he claim any inability to prepare closing papers. Further, he did not object to the tender of a cashier's check in lieu of cash and, as far as appears, made no attempt to contact Prescott. The following day, on October 21, 1981, Fender brought an action for specific performance of the buy-sell agreement.

### DIVERSION OF CORPORATE OPPORTUNITIES

The record reflects that Prescott had "great misgivings" about proceeding to sell, partially as a result of defendant's claim that plaintiff had interfered with Prescott's attempt to acquire for himself the Merchants Refrigerating Co. cold storage facility in Manhattan. Fender claims that Prescott, in his capacity as officer and director of National, learned that the facility might be available and, in December, 1979, well in advance of execution of the buy-sell agree-

ment, made a personal offer to acquire the warehouse for National, which was refused. Although Fender made numerous inquiries as to the progress of the negotiations, on each occasion he was advised that Prescott was continuing to pursue the matter. On June 29, 1981, three months after the parties had entered into the buy-sell agreement, Prescott renewed his efforts to secure the facility and on June 30, made a written offer for himself.

Fender, alleging that Prescott was attempting to divert corporate opportunities of National, brought two derivative actions to prevent the acquisition of the Merchant's warehouse and the asbestos plant, which actions were consolidated. In granting Prescott's motion for summary judgment, Special Term found from the proofs submitted that both parties had sought acquisitions for their own account as well as for National and concluded, (1) the acquisition of the asbestos plant was not a business opportunity of National as a matter of law, since the plant was not related in any way to National's business and, (2) the attempt to purchase the Merchants cold storage warehouse was not a diversion of any business opportunity from National since Prescott's attempt to acquire the facility postdated the buy-sell agreement, following which he owed no fiduciary duty to Fender with respect to National.

We disagree with both conclusions and, accordingly, reinstate the complaints in the consolidated action.

Prescott, as a shareholder, officer and director of a close corporation, was subject to a standard of honesty and good faith which required that he devote his undivided and unqualified loyalty to the corporation. The fiduciary duty imposed upon him prevented him from placing his private interests in conflict with those of the corporation (*Foley v D'Agostino,* 21 AD2d 60, 66-67). We recently observed in *Matter of Ronan Paint Corp.* (98 AD2d 413), that the relationship between shareholders in a close corporation, vis-à-vis each other, is akin to that between partners and imposes a high degree of fidelity and good faith (see, also, *Matter of Gordon & Weiss,* 32 AD2d 279, 281; *Matter of Pivot Punch & Die Corp.,* 15 Misc 2d 713, 716, mod on other grounds 9 AD2d 861). As was observed by Chief Judge Cardozo in *Meinhard v Salmon* (249 NY 458, 464): "A

trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." The principle operates to prevent a fiduciary from entering into competition with or otherwise personally profiting at the expense of the corporation (see *Brown Assoc. v Fileppo*, 38 AD2d 515).

Contrary to the holding at Special Term, the fiduciary duty thus imposed was not automatically extinguished by the agreement of the two principals to go their own way. After execution of the agreement, Prescott remained as an officer, director and shareholder of National at least until the closing. Since the buy-out never took place, he was subject to the same fiduciary duty as existed previously and from which he would be relieved only upon his withdrawal from the corporation (see *Sohon System v Troub*, 252 App Div 553, 554). To conclude otherwise would produce a most inequitable, unconscionable and inconsistent result, permitting him to rely upon the existence of the buy-out agreement to avoid his fiduciary obligation to the corporation and to plaintiff while simultaneously refusing to proceed to closing and transfer his shares in accordance with that very agreement. The strict standard of good faith imposed upon a fiduciary may not be so easily circumvented. Under the circumstances, we disagree with the conclusion of Special Term that the trust relationship terminated solely upon execution of the unperformed buy-sell agreement. The complex factual issues as to whether there had been a misappropriation and diversion of a corporate opportunity cannot be resolved on this record, particularly in light of the conflicting affidavits adduced on the issue.

Nor may we resolve as a matter of law whether Prescott's purchase of the asbestos plant in Louisiana amounted to a diversion of a corporate opportunity of National. Special Term erroneously relied upon a rigid adherence to the "line of business" test (*Burg v Horn*, 380 F2d 897, 901, n 3). Clearly, there is sufficient in the record to pose triable issues as to whether the principals of National sought to limit its business ventures and acquisitions geographically, to the New York-New Jersey metro-

politan area or to the cold storage warehouse business and whether they have in the past acquiesced in individual deals and the nature of those transactions. The affidavits offered pose sharp factual issues which cannot be resolved summarily, particularly bearing in mind the limited function of the court on a motion for summary judgment as issue finding, not issue determination (*Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404; *Esteve v Abad,* 271 App Div 725, 727).

### SPECIFIC PERFORMANCE OF BUY-SELL AGREEMENT

Applying this same standard, we find no factual issue to warrant denial of plaintiff's motion for specific performance. The terms of the buy-sell agreement are clear and specific and required defendant to transfer his shares to plaintiff upon Fender's exercise of the option provided for in the agreement. Although Prescott had prior notice to schedule the closing on either of two dates when Fender would be in New York, it does not appear that he made any arrangements to do so nor did counsel draw any closing papers or take any other steps for the closing. It is conceded that when Kokot met with Fender and his attorney on October 19, 1981, plaintiff advised that he was ready to close and had with him a cashier's check. Nevertheless, Prescott did not appear at his attorneys' office on the appointed date and has palpably demonstrated an unwillingness to proceed to closing.

The objections sought to be raised here were never asserted by Kokot when plaintiff appeared, prepared to close, and are insufficient in any event. Kokot did not challenge the sufficiency of notice nor did he claim that he was unable to prepare closing papers. When advised that plaintiff was ready to proceed, he only stated that he lacked the authority of his client. The tender of a cashier's check in place of cash, representing the net balance of the purchase price, was sufficient. Such an instrument is the equivalent of cash in the commercial world (see *Goshen Nat. Bank v State of New York,* 141 NY 379, 387; *Dziurak v Chase Manhattan Bank,* 58 AD2d 103, 107, affd 44 NY2d 776; *Kaufman v Chase Manhattan Bank,* 370 F Supp 276, 278-279). Had any objection been raised with respect to the use of such a check, an escrow could have been arranged

pending clearance or alternative financing since, at the time of the aborted closing, there were three days remaining within the agreed time to close. It appears, however, that Kokot never examined the check and never raised any objection other than that he lacked authority. Under the circumstances, in view of the default, it was unnecessary for Fender to attempt a further tender during the remaining time (see *Allbrand Discount Liqs. v Times Sq. Stores Corp.,* 60 AD2d 568).

We have examined the other arguments offered by defendant and find that they lack merit. The buy-sell agreement contained a sufficient indemnity and hold-harmless covenant from Fender, as the purchaser, which took effect on closing upon exercise of the option. Clearly, a further separate writing was not required. Equally lacking in merit is the claim that Fender did not intend to manage the business but instead, planned to resell National to a third party. The agreement specifically contemplates such a possible transfer and provides for an adjustment of the purchase price in favor of the seller in such event.

In opposing a motion for summary judgment, it is incumbent upon a party to demonstrate that there is a genuine triable issue of fact (*Zuckerman v City of New York,* 49 NY2d 557, 562; *Alvord & Swift v Muller Constr. Co.,* 46 NY2d 276, 281-282; *Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285, 290). Mere conclusions or unsubstantiated allegations or assertions are insufficient for that purpose. The issue must be shown to be real, not feigned since a sham or frivolous issue will not preclude summary relief (*Sprung v Jaffe,* 3 NY2d 539, 543; *Kornfeld v NRX Technologies,* 93 AD2d 772, 773, affd 62 NY2d 686). As was observed by Justice Shientag in *Hanrog Distr. Corp. v Hanioti* (10 Misc 2d 659, 660): "A shadowy semblance of an issue is not enough to defeat the motion." Here, there are no real, bona fide issues to be resolved at trial and the sham defenses interposed were palpably insufficient to defeat the motion.

Accordingly, the order, Supreme Court, New York County (Irving Kirschenbaum, J.), entered April 21, 1983, granting defendant Prescott's motion for summary judgment dismissing the complaints, should be reversed, on the

law, with costs and disbursements, the motion denied and the complaints reinstated. The order, Supreme Court, New York County (Alvin Klein, J.), entered October 17, 1983, denying plaintiff's motion and defendant's cross motion for summary judgment, should be modified, on the law, with costs and disbursements, to grant plaintiff summary judgment for specific performance of the buy-sell agreement entered into June 9, 1981, and otherwise affirmed.

KUPFERMAN, J. P., SANDLER, FEIN and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on April 21, 1983, unanimously reversed, on the law, the motion for summary judgment denied, and the complaints reinstated. Appellant shall recover of respondent $75 costs and disbursements of this appeal.

Order, Supreme Court, New York County, entered on October 17, 1983, unanimously modified, on the law, to grant plaintiff summary judgment for specific performance of the buy-sell agreement entered into June 9, 1981, and otherwise affirmed. Plaintiff-appellant-respondent shall recover of defendant-respondent-appellant $75 costs and disbursements of this appeal.