In re Daniel PHILLIPS, Debtor.

Charles FERRARO, Individually and as a Shareholder of Advertising Services Plus, Inc., Plaintiffs,

v.

Daniel PHILLIPS and Advertising Services Plus, Inc., Defendants.

Bankruptcy No. 893–80461–478.
Adv. No. 893–8202–478.

United States Bankruptcy Court, E.D. New York.

Aug. 11, 1995.

Steven M. Critelli, Garden City, NY, for plaintiffs.

Abel Jack Schwartz, Hewlett, NY, for debtor.

## DECISION ON ADVERSARY COMPLAINT OF CHARLES FERRARO, INDIVIDUALLY AND AS A CORPORATE SHAREHOLDER ON BEHALF OF THE CORPORATION OBJECTING TO THE DISCHARGEABILITY OF CERTAIN DEBTS

DOROTHY EISENBERG, Bankruptcy Judge.

The matter before the Court is an adversary proceeding commenced by Charles Ferraro (the "Plaintiff") individually and as a shareholder of Advertising Services Plus, Inc. ("Advertising Plus"), objecting to the discharge of certain debts of Daniel Phillips (the "Debtor"), pursuant to 11 U.S.C. Section 523(a)(2) and (a)(4) of the Bankruptcy Code (the "Code"). The Court having reviewed and considered the pleadings, documentary and testimonial evidence, and the relevant case-law, finds that the Plaintiff has sustained his burden of proof under Section 523(a)(2) and (a)(4). Accordingly, and for the reasons set forth below, certain particular debts of the Debtor to the individual Plaintiff and to Advertising Plus are non-dischargeable.

### FACTS

On January 27, 1993 the Debtor filed a voluntary Petition for Relief under Chapter 7 of the Code. The instant adversary proceeding was timely commenced by the filing of a Complaint by the Plaintiff on May 6, 1993. An Answer was interposed on behalf of the Debtor on June 24, 1993. A trial on the issues was commenced before this Court on

December 8, 1993 and concluded on August 16, 1994.

In December, 1985, the Plaintiff and Debtor (the "Parties") incorporated Advertising Plus. An oral agreement between the Parties established that each would contribute $10,000 in initial capital and operate the business, for tax purposes, as a Sub–Chapter S corporation. Each co-owner would be entitled to fifty percent of the net corporate profits, notwithstanding certain adjustments for two client relationships.

The Parties agreed to a weekly salary of $500 each, plus additional compensation, paid by weekly checks drawn to "cash." The added compensation was derived from the net income of corporate accounts except for the Roma Furniture account ("Roma"), attributed solely to the Debtor, and the Finger Foods account ("Finger Foods"), attributed solely to the Plaintiff. These methods of accounting and compensation were intended to adjust for business expenses related to the Roma and Finger Foods accounts so that each of the Parties, in keeping with their agreement made at the time of incorporation, received all of the net profits related to their respective client account and half of the net profits of the shared client accounts. It was not intended that Advertising Plus, or the other co-owner, would absorb any of the expense related to either of these two clients. The business was sufficiently successful that by March, 1986, the Parties were able to withdraw their $10,000 capital investments and thereafter, for most of the next six years, the business cash flow sustained the operations of Advertising Plus.

Likewise, to account for the operating expenses of Advertising Plus, the Parties initially agreed to an allocation of overhead costs, in addition to direct costs attributed to a particular account, based on the percentage of sales generated by that account. For example, if one account represented forty percent of the total sales for Advertising Plus in a given year, then forty percent of Advertising Plus' operating expenses for that year would be applied to that account, together with any direct expenses related to the same account. This arrangement is evidenced in the financial records for the years 1986 and 1987. There appears thereafter to have been a change in the manner of cost allocation. Commencing with 1988, the financial records reflect an application of a flat twenty five percent allocation of operating costs to the Roma account.

The Parties were the only officers, directors and equal fifty percent shareholders of Advertising Plus. The Debtor, the self described "rainmaker," or business developer, was designated corporate president and treasurer. In addition to servicing Roma, he acted as the chief financial officer responsible for the day-to-day business operations of Advertising Plus. The Plaintiff was designated corporate vice president and secretary and was primarily engaged in client relations and advertising production. Based upon the testimony of the Parties, the Debtor wanted to associate with a strong marketing executive. The Plaintiff had twenty-two years of marketing experience and received industry awards in recognition of his achievements in that field. The agreed areas of responsibility were based on the prior work experiences of the Parties.

Further, it was understood that each would receive certain fringe benefits, including a gasoline credit card for business travel, health insurance, and reimbursement for corporate travel and entertainment. The Debtor was permitted to carry a car lease through Advertising Plus, subject to that cost being offset against income from the Roma account. This was agreed as a continuation of the Debtor's previous practice and thus allowed for his existing car lease to be continued through the new business venture.

Thereafter, it was further agreed that the Debtor could pass the monthly expense of a car telephone on to Advertising Plus and a monthly life insurance premium of $27, again subject to offset against the Roma account. The Plaintiff did not have a similar arrangement for a leased car and personally paid for his car and the related maintenance expenses. Further, the Parties agreed that for tax purposes certain non-corporate expenses were be categorized as business expenses.

Subsequently, Advertising Plus issued checks totalling $100,050 to Carol Phillips,

wife of the Debtor, with the understanding that such payments would be counted as part of the compensation due to the Debtor. Although these payments were recorded as wages in the corporate records, Mrs. Phillips was at no time employed by Advertising Plus.

At the inception of Advertising Plus, the Debtor had opened a checking account in the name of Advertising Plus for general business purposes (the "General Account") and thereafter established at least one other checking account (the "Special Account"). The Parties agreed that the Special Account would be used exclusively to pay media suppliers with funds received from Advertising Plus' clients for that specific purpose. Only funds received from clients for media purchases were deposited to the Special Account.

Initially, the Debtor was the only party authorized to sign checks on these accounts. The Plaintiff was later given authority to co-sign checks with the Debtor on the General Account. Virtually all of the checks co-signed by the Plaintiff were issued between February, 1987 and May, 1989.

However, the Plaintiff was neither authorized to co-sign checks drawn on the Special Account nor was he authorized to issue checks without the signature of the Debtor. The Plaintiff co-signed some checks issued to outside suppliers and drawn on the General Account and numerous checks issued for employees' salaries and officers' compensation.

To facilitate the management and recording of business transactions Advertising Plus employed a bookkeeper and utilized the services of accountants from shortly after inception until the demise of the business. The bookkeeper, Cynthia Auerbach, was employed at the Corporate office from mid–1986 until some time in 1992. Her responsibilities included maintaining the financial records of Advertising Plus and preparing checks, as directed by the Debtor. She had little interaction with the Plaintiff and until October, 1991, did not tell the Plaintiff anything regarding the Debtor's personal expenses being paid through Advertising Plus or Debtor's cashing of salary checks and other checks drawn to cash. In fact, she believed

that the Debtor was the principal owner and refrained from offering information regarding the Debtor's financial transactions to the Plaintiff for fear of losing her position. At the direction of the Debtor, the bookkeeper maintained ledger cards for all Advertising Plus' accounts payable. However, unlike Advertising Plus' accounts payable, no ledger cards or copies of bills were provided to her for the Debtor's personal expense items which, when totalled, exceeded $225,000, which Debtor paid with funds from Advertising Plus. *See*, The five Advertising Plus Journals marked as one exhibit, consisting of one Cash Receipts Journal, one Sales Journal, one Cash Disbursement Journal, and two Purchase Journals, Joint Exhibit 95 ("95–Journals").

The first accountant engaged by Advertising Plus, Miriam Bell ("Bell"), performed services from early 1986 until mid–1989. Advertising Plus thereafter used the firm of Giffuni and Young, Certified Public Accountants ("CPA's"), until mid–1991, when the CPA's withdrew their services on account of nonpayment of fees. Both Bell and the later CPA's usually met with the Debtor; Bell on a monthly basis. Any conversations with the Plaintiff, by either accounting firm, were typically related to an annual meeting with both Parties to summarize the prior year's operations. Although at all times, the books and records of Advertising Plus were available to him, the Plaintiff's knowledge of Advertising Plus' financial health was largely confined to information offered by the Debtor and the annual meeting with the accountants to review the year-end results.

The Parties accepted the practice of minimal financial records for Advertising Plus. The statements that were prepared lacked detailed audit verification and analysis by the accountants of the books and records of Advertising Plus. The accountants were relying upon the representations made by the Debtor. Except for the short annual reviews with the Parties, the financial activities of Advertising Plus were not typically discussed with the Plaintiff and were largely confined to the Debtor. The annual meeting with the accountants usually utilized a one-page document that summarized Corporate income, ex-

pense and allocations among the shared and the agreed, separate accounts. *See,* Financial Statement of Advertising Plus for the Year Ended November 30, 1986, Joint Exhibit 2 ("Exhibit 2"); Financial Statement of Advertising Plus for the Year Ended November 30, 1987, Joint Exhibit 9 ("Exhibit 9"); Financial Statement of Advertising Plus for the Year Ended December 31, 1988, Joint Exhibit 19 ("Exhibit 19"); Even-up Schedule of Advertising Plus for 1989, dated June 20, 1990, Joint Exhibit 20 ("Exhibit 20"); Total Even-up Schedule for Advertising Plus for December 31, 1990, Joint Exhibit 21 ("Exhibit 21"); Even-up Profit/Loss Statement of Advertising Plus for Period Ended December 31, 1990, Joint Exhibit 22 ("Exhibit 22").

The Debtor supervised the bookkeeper, received the incoming daily mail, conducted Advertising Plus' banking business, controlled the daily transaction activity on Advertising Plus' checking accounts and had most of the conversations and meetings with the accountants. Based upon their testimony, neither the bookkeeper nor at least one of the accountants, Mr. Giffuni, believed that the Plaintiff had any significant understanding of the financial activities of Advertising Plus, whereas the Debtor had behaved in a manner that conveyed an intent to conceal personal transactions in the accounts of Advertising Plus. When discussing Advertising Plus' financial circumstances with the Debtor alone, Mr. Giffuni testified that he was told by the Debtor that "Charlie," the Plaintiff, did not need to know about certain financial matters.

From 1986 through 1991, the Debtor drew salary and expense checks for himself and his spouse, well over the salary agreement made at the time of incorporation. In fact, the Debtor overdrew the net profit due him from the Roma account by $205,584.00. *See,* Summary Prepared by Plaintiff, of Debtor's Salary/Compensation for Years 1986–1991, Joint Exhibit 71; Listing, Prepared By the Plaintiff, of Payroll Checks Issued to the Debtor From 1986 to 1991, Joint Exhibit 69 ("69–Debtor's Paychecks"); Summary, Prepared By the Plaintiff, of Advertising Plus Checks Issued By the Debtor, Joint Exhibit 68 ("68–Debtor's Expenses"); Listing, Pre-

pared By the Plaintiff, of Payments Made By Advertising Plus For Certain Expenses from January, 1986 through December, 1991, Joint Exhibit 29 ("29–Debtor's Personal Expenses"). Additionally, he withdrew funds from the Special Account for personal expenses unrelated to the stated business purpose of that account. Most of these payments were taken without the knowledge or consent of the Plaintiff. Only three (3) of the 696 corporate checks drawn for the Debtor's personal expenses bear the Plaintiff's co-signature.

Moreover, approximately 5,000 checks were drawn on the two Advertising Plus accounts over six years. Among these were 1,397 checks payable to the Debtor and his wife for salary and expenses of which the Plaintiff co-signed only 255. Furthermore, over the six years of Advertising Plus' activity, the Plaintiff co-signed a total of only 861 checks, of which 799 were for payroll and the balance to trade suppliers. During this same period, the Debtor cashed 136 checks, amounting to $70,955, drawn on the Special Account for which the Debtor was the sole authorized signatory and where the account was intended to be used exclusively for payment of media from designated funds submitted by the clients to pay for their media expense.

The Debtor made false written representations to the Plaintiff regarding the financial condition of Advertising Plus. Further, the body of financial statements produced by the accountants for the years 1986 through 1990 were the direct result of the information supplied to the accountants by the Debtor, and as such, were materially false. In August, 1990, relying upon the financial information provided by the Debtor, directly and through the CPA's, the Plaintiff signed a personal guarantee for a lease covering computer equipment to be used by Computer Sportscards, Inc. ("Sportscards"), a new venture in which both Parties had an interest. The Parties understood Advertising Plus would be paying Sportscards' expenses until that entity could financially support itself. Subsequent events led the leasing companies to sue the Parties. Litigation against the Debtor was stayed by his filing of a Chapter

7 petition. The Plaintiff settled one claim against himself for $5,000 and on a related claim, a judgment of $25,829.13 was entered against him in late 1993. The Plaintiff was thereby damaged in the amount of at least $30,829.13.

Similarly, the Plaintiff borrowed $10,000 from a bank and loaned the funds to Advertising Plus at the Debtor's request in May, 1991. The loan to Advertising Plus was to cover "cash flow" needs and was given without the Plaintiff having knowledge of the actions by the Debtor that contributed to the deficit cash flow. The Plaintiff, although never repaid by Advertising Plus, repaid this bank loan with interest of $911; thereby sustaining damages in the additional sum of $10,911.00.

The Plaintiff began to challenge the accounting of Advertising Plus' financial activity only when he became aware of a serious, negative impact on Advertising Plus, hence his share of net profits, in mid–1991. The CPA's had just provided reports for the year ended December 31, 1990 (Exhibits 21 and 22) which indicated a loss of $200,000. The CPA's determined that Advertising Plus had a negative cash position of $188,000, attributed by the CPA's to excessive officer compensation and a drain of cash to finance the new venture, Sportscards. (Joint Exhibits 21, 22 and 89). The CPA's explained that Advertising Plus could not support any officer compensation for 1990, yet the Debtor had taken $180,250, including $42,100 for personal expenses (Exhibit 69).

The Plaintiff, based on the prior year-end report from the CPA's, believed he had been due over $48,200 in undistributed profits as of December 31, 1989 and had drawn $50,200 in 1990. By the Columbus Day weekend of 1991, when the Debtor failed to explain the change in the financial condition of Advertising Plus, the Plaintiff made his first detailed review of the books and records.

The Plaintiff claims that 696 checks had been drawn on Advertising Plus' accounts to pay $225,704 in personal expenses of the Debtor and his wife. (Joint Exhibits 29 and 68–Debtor's Expenses). Included among the personal expenses were the car lease and related repair/insurance/gasoline/phone, liquor, credit cards, insurance premiums, medical bills and personal income tax payments. Additionally, payments were made to contractors that worked on Debtor's residence, for vacation trips and Debtor's personal legal fees and boat repairs. All of these and more expenses were lumped together and recorded as "operating and selling expenses", some with notations of "vendor" or "art work" leading the accountants to prepare erroneous reports that overstated expenses and, ultimately, reduced the net profits available for distribution to the Plaintiff.

Plaintiff, noting the original agreement between the Parties, concedes the usual and customary expenses related to the car and approximately $2,000 in business related travel and entertainment expenses. However, the Plaintiff, who did most of the business travel for Advertising Plus as part of his job responsibilities, expensed only $9,656 through Advertising Plus for gasoline purchases over the same six years. The $26,576 in gasoline charges expensed by the Debtor was alleged to have been, in part, to cover fuel used to operate the Debtor's boat while entertaining business clients. At trial, the Debtor could recall only one client by name that he claimed to have entertained on the boat. Further, the Debtor stipulated to any credit card charges attributed to his spouse and paid by Advertising Plus as personal expenses that ought not to have been paid by Advertising Plus. The Debtor attempted at trial to provide a partial explanation for his personal credit card debts having been paid by Advertising Plus. However, the Debtor failed to offer any evidence to substantiate his claims of having made loans to Advertising Plus or having been repaid for said loans through credit card payments.

Likewise, the Debtor signed and submitted tax returns to the Internal Revenue Service (the "IRS") for Advertising Plus for the years 1985, 1986 and 1987 that falsely stated that he was the one hundred percent shareholder of Advertising Plus. The Debtor admits that he used these tax returns to obtain a line of credit from European–American Bank, falsely representing himself to the bank as the sole owner of Advertising Plus.

No financial reports were prepared by the CPA's for the year ended December 31, 1991, as they had terminated their relationship with Advertising Plus at mid-year. The available records that were submitted into evidence indicate that the gross income of Advertising Plus for 1991 was $226,996. Net profit before officers' compensation was $77,593, including sums derived from Roma and Finger Foods. However, the Parties drew $166,910 in combined compensation for the year. From this total, the Debtor took $126,704, including $22,704 for personal non-business expenses. Further, a related account of Roma, Rapunzel Beauty Salon, owed Advertising Plus $10,804, which was satisfied by providing the Debtor personally with certain furniture.

Adding to Advertising Plus' financial difficulties in 1991, one of the Parties' shared accounts, Price Cutters, terminated their relationship with Advertising Plus. This was a result of the Debtor using funds from the Special Account to pay personal expenses, rather than the media suppliers. Price Cutters had previously paid Advertising Plus for advertising and Advertising Plus was to then pay the media suppliers through the Special Account. However, a $98,000 deficit arose with the media suppliers and Price Cutters was being dunned for the shortfall, having already paid the money to Advertising Plus.

By the end of 1991, the accounts payable exceeded the net accounts receivable by approximately $152,000. Further, there was a bank credit line of $30,000 outstanding and federal and state tax liability amounting to some $60,000. It is unclear whether the bank debt and tax liability of Advertising Plus, or any other creditors of this corporation, has since been paid. Late in 1991, the Internal Revenue Service seized $41,000 in accounts receivable due from Roma and Price Cutters in payment of liens for unpaid payroll taxes, penalties and interest.

The Plaintiff left Advertising Plus near the end of 1991 and resigned at the end of January, 1992. The Debtor attempted to continue to operate the business by using another entity he controlled, Moving Impressions, Inc. The Debtor reissued bills to clients of Advertising Plus, seeking to have payment(s) made to the other entity. It is unknown if any accounts receivable of Advertising Plus were collected by Moving Impressions, Inc. Mounting financial and legal pressure resulted in Advertising Plus ceasing all operations by mid–1992.

### DISCUSSION

The central question the Court is asked to decide is whether based upon the afore-referenced facts, the Debtor breached his fiduciary responsibilities to Advertising Plus and the Plaintiff under Section 523(a)(2) and (a)(4). Before addressing that question, the Court must first determine whether the Plaintiff, as a shareholder of Advertising Plus, has standing to bring this action.

New York courts have allowed co-owners of closely held corporations to bring derivative actions against other co-owners. *See, e.g., Fender v. Prescott*, 101 A.D.2d 418, 476 N.Y.S.2d 128, *aff'd* 64 N.Y.2d 1077, 489 N.Y.S.2d 880, 479 N.E.2d 225 (1985). To determine when an action sets forth a derivative or a direct claim, a court will usually look to whether it was the corporation or the individual that sustained the direct injury. *See, In re Penn Central Securities Litigation*, 347 F.Supp. 1324, 1327 (E.D.Pa.1972). Where, as in this case, the matter concerns a closely held corporation in which all ownership is vested in the two parties to the lawsuit, there can be little doubt that any injury to the corporation caused by one fifty percent owner is in fact a direct injury to the other owner. Therefore, Plaintiff's injury is direct whether he sues directly as an individual or as a shareholder.

Courts have recognized that a derivative suit may be preferable to a direct action where an award of an asset directly to an individual could impair the rights of creditors whose claims may be superior to that of the prevailing individual. *Glenn v. Hoteltron Systems, Inc.*, 74 N.Y.2d 386, 547 N.Y.S.2d 816, 547 N.E.2d 71, 74 (1989). This Court must be mindful of the interests of creditors of Advertising Plus who were not party to this litigation. Since as all claims herein relate to misappropriation of Advertising Plus' assets, a derivative suit will ensure the

equitable distribution of any award. *Glenn,* 547 N.Y.S.2d at 819, 547 N.E.2d at 74.

Since the direct injury threshold is met, the Plaintiff has standing as a shareholder. The Debtor argues that *Intertherm, Inc. v. Olympic Homes Systems, Inc.,* 569 S.W.2d 467 (Tenn.Ct.App.1978) precludes a fifty percent shareholder from bringing such an action against the other similar shareholder where both parties fully shared the day-to-day operations of the business. However, the evidence presented demonstrates that the Parties did not equally manage the financial affairs of Advertising Plus. Further, it appears to this Court that the Debtor relied on the Plaintiff's lack of business acumen to enrich himself at the expense of the Plaintiff. To the extent that the Plaintiff has been injured from breach of fiduciary obligations flowing directly to him, he has standing as an individual.

■ Furthermore, every creditor has standing to challenge a debtor's discharge and seek a determination that a debt is not dischargeable. *In re Graziano,* 35 B.R. 589, 593 (E.D.N.Y.1983). The term "creditor" includes those entities claiming a right to payment on a debt that arose pre-petition, even if such debt is disputed. *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). Here, the Plaintiff as both an individual and a shareholder of Advertising Plus is an entity claiming a right to payment on pre-petition unliquidated debts.

Having found that the Plaintiff has standing to proceed, and based upon the fact that a stockholder's derivative suit may be the basis for a determination of nondischargeability under Section 523 (*See e.g., In re Jackson,* 141 B.R. 909 (N.D.Texas 1992)), this Court can focus on the central question of whether the Debtor violated his fiduciary duty to Advertising Plus and the Plaintiff under Section 523(a)(2) and (a)(4) of the Code which states, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

.    .    .    .    .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

■ More specifically, the issues before the Court pertain to whether certain conduct by the Debtor constituted a breach of the Debtor's fiduciary responsibility to Advertising Plus and to the Plaintiff. Further, this Court must consider whether the Plaintiff reasonably relied on the representations made by the Debtor concerning the financial condition of Advertising Plus. It was the Debtor who provided the information to the accountants who prepared erroneous financial statements as to the expense allocated to Advertising Plus and the funds Debtor claimed were due to him from the Roma account. Based upon the pleadings, the exhibits introduced at trial and the testimony adduced at trial, this Court finds that the Plaintiff has sustained his burden of proof that the Debtor breached his fiduciary responsibility and that the Plaintiff reasonably relied on the oral and written representations made by the Debtor concerning the financial condition of Advertising Plus.

The Court makes special mention of its reliance on the testimony of both Advertising Plus' bookkeeper, Ms. Auerbach, and the accountant, Mr. Giffuni, CPA. Where trial testimony is largely derived from the two opposing parties, any independent source is welcomed and, in the present case, most compelling. Additionally, many of the Joint exhibits submitted into evidence were personally pre-

pared by the Plaintiff and the Court notes the Debtor's counsel's characterization of the Plaintiff's search of Advertising Plus' books and records as "a very exhaustive analysis." The Plaintiff's exhibits were not refuted or overcome by other testimony or evidence introduced at trial.

In order for a creditor to meet its burden to obtain an exception to discharge, the creditor has the burden of proof by a preponderance of evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). The Court first considers non-dischargeability under Section 523(a)(4) pursuant to which the Plaintiff must prove that the Debtor was a fiduciary of Advertising Plus, and that while acting in that fiduciary capacity, the Debtor committed a defalcation. *In re Cummins,* 166 B.R. 338, 352 (W.D.Ark.1994).

A determination of when a fiduciary relationship exists for purposes of Section 523(a)(4) is established by looking to state law. The New York State law is in line with the decision in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Since the Supreme Court decision in *Pepper,* the bankruptcy courts have held that a director, officer, or majority shareholder is a fiduciary of the corporation. *Pepper* decided an issue of equitable subordination of an "insider's" claim upon a corporate debtor. Section 101(31) of the Code defines an insider of a corporate debtor as another entity with common ownership, directors and officers. In *Pepper,* the Supreme Court generated two principles to be considered relative to the inequitable conduct: 1) following a plaintiff's presentation of unfair conduct, a defendant has the burden to demonstrate the good faith and fairness of the disputed transactions and 2) the court gives "special scrutiny" to the insider's transactions with the corporate debtor. *Pepper,* 308 U.S. at 306, 60 S.Ct. at 245. *See, e.g., Matter of Candlewood Shores Estates, Inc.,* 20 B.R. 377 (Bankr.D.Conn. 1982) (holding, *inter alia* that when officers or directors transact business with their corporations, they are held to a strict standard of fair dealing and, if challenged, bear the burden of showing the personal dealing to be fair, in good faith and for adequate consideration.)

In the case before this Court, neither the Plaintiff nor the Debtor is a corporate entity. Yet the Parties were the sole and equal owners of Advertising Plus, each with a fiduciary responsibility to the business and to each other. Mindful of *Grogan* and given the totality of the circumstances, this Court believes that the essence of the *Pepper* principles are applicable to the Parties. The testimony and documentary evidence demonstrate that the Debtor acted unfairly when he took excessive salary and paid his personal expenses through Advertising Plus. The Debtor has failed to set forth any evidence demonstrating that the transactions were fair or done in good faith. The Court need not even reach to "special scrutiny" to find that the Debtor attempted to conceal these acts from the Plaintiff by not giving an accurate accounting of the funds drawn from Advertising Plus' accounts. As Mr. Giffuni testified, the Debtor told the CPA's that "Charlie didn't need to know certain things." The structure and manner of operation of Advertising Plus served to facilitate the harmful acts of the Debtor.

An officer's unauthorized withdrawal of corporate funds for compensation constitutes "defalcation," and "embezzlement" within the meaning of Section 523(a)(4), rendering the resulting corporate debt non-dischargeable. *In re Johann,* 125 B.R. 679 (M.D.Fla.1991). Significantly, the Debtor withdrew large sums, totalling over $70,000, from the Special Account to pay for his personal expenses. He did this with the knowledge that the Special Account was funded exclusively with client deposits designated for payment to media suppliers. This action by the Debtor in abusing this account ultimately resulted in the loss of Price Cutters, a significant client. Nevertheless, the Debtor offers no explanation or justification for this particular action which seems to violate his duties to Advertising Plus.

The Parties had initially agreed to pay themselves $500.00 each per week plus an additional $300.00 each per week via checks drawn to "cash." Thereafter, the Debtor had the Plaintiff co-sign checks payable to the

Debtor, or the Debtor's spouse, as per the weekly salary/compensation arrangement. Simultaneously therewith, the Debtor wrote additional check(s) for further compensation to himself.

Similarly, the Parties had, at the inception, agreed that the Debtor would retain the net profits of the Roma account. Thereafter, the Debtor failed to apply all of the direct expenses of Roma to that account. Additionally, the Debtor failed to apply certain agreed charges to Roma. In violation of the agreement between the Parties, both the direct and indirect Roma expenses were lumped under Advertising Plus' other "operating and selling expenses", which resulted in a reduction in Plaintiff's share of profits to which he would otherwise be entitled.

Based upon the testimony and documentary evidence submitted, the Court concludes that the Debtor willfully sought to mislead the Plaintiff as to the amount of compensation the Debtor was taking at any particular time, the higher costs associated with the Roma account and the lower operating expenses of Advertising Plus. Taken together, the acts of the Debtor served to reduce the profits of Advertising Plus, diminish the net profits due to the Plaintiff and significantly impact the financial viability of the business.

The Debtor argues that he was the principal party, the "rainmaker," of Advertising Plus, and as such, was entitled to the greater compensation. Further, he points to the Roma relationship and the net income earned from that account as money the Parties agreed was the Debtor's alone. Moreover, he argues that the Plaintiff partook in similar acts and ratified the Debtor's actions, citing *Steinberg v. Steinberg*, 106 Misc.2d 720, 434 N.Y.S.2d 877 (1980). This Court notes that unlike *Steinberg*, here the magnitude of the acts of the Plaintiff in no manner approach that of the Debtor; nor is there any evidence that the Plaintiff acted without the knowledge and implied consent of the Debtor.

Similarly, the Debtor argues that *Gottfried v. Gottfried*, 112 N.Y.S.2d 431 (1952) supports his contention that the Plaintiff is precluded from bringing a derivative action where the directors/shareholders accepted various benefits as a longstanding practice and "personal expenses had been accorded without the necessity of furnishing a detailed or documented account," quoting the Debtor's Post–Trial Memorandum of Law. This Court notes a distinction from that case since the Plaintiff was never made aware of the Debtor's practice of paying personal obligations with corporate funds. One cannot ratify that which is unknown.

Further, citing *In re Gelder's Will*, 112 N.Y.S.2d 428 (1952), while evidently intending to cite *Gottfried*, the Debtor argues that the Plaintiff waived his right to object to the actions of the Debtor that may have constituted a wrong where the Plaintiff consented or participated in the same actions. The Court is aware that the Parties concealed a portion of their compensation, presumably for tax purposes, by taking payments via checks payable to "cash", and does not condone such actions. Both may be liable for payment of taxes. However, given the totality of the circumstances, the Court will neither characterize these actions on par with the detailed acts of the Debtor nor equate the facts in *Gottfried* with those in the non-dischargeability matter before this Court. Furthermore, virtually all of the acts of the Plaintiff were under the terms of the agreement made between the Parties at inception and, in all events, were with the knowledge and consent of the Debtor. The Court notes the Parties' agreement concerning benefits due the Plaintiff, aside from salary; specifically, a gasoline credit card for corporate use, reimbursement of business related travel and entertainment expenses, and health insurance. Further, the Court acknowledges the testimony concerning medical expenses related to the Plaintiff's son, amounting to as much as a few thousand dollars and paid through Advertising Plus. Conversely, the Debtor failed to show, by credible testimony or compelling documentary evidence, that the Plaintiff consistently knew and thoroughly understood the scope and nature of the abuse of Advertising Plus' accounts by the Debtor. It follows that the Plaintiff never gave informed consent to such activity by the Debtor.

Furthermore, the limited financial information provided to the accountants by the

Debtor, without independent audit or verification by them, further served to lull the Plaintiff with a false sense of reality and security. The Plaintiff looked at the financial information prepared by the accountants and saw only that which the Debtor intended him to see.

Finally, it is the finding of the Court that the Debtor did not reveal the true financial condition of Advertising Plus or his unwarranted withdrawals when he asked the Plaintiff to sign the equipment lease guarantee in August, 1990 and lend Advertising Plus $10,-000 in May, 1991. At the time, only the Debtor knew or should have known the true financial condition of the business. It is not credible that the Plaintiff would have agreed to guarantee the equipment lease or advance a loan to Advertising Plus without relying on the information supplied by the Debtor. As the record reflects, Plaintiff was damaged in this regard to at least the sum of $41,740.13.

Applying the specific elements within the Code under Section 523(a)(2), this Court finds as follows:

A materially false statement is a statement that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally effect the decision to grant credit." *In re Nance,* 70 B.R. 318, 321 (Bankr.N.D.Tex.1987), *citing In re Denenberg,* 37 B.R. 267 (Bankr.D.Mass.1983). Materiality should be determined by comparing Advertising Plus' actual financial condition with the picture painted by the Debtor. *Id.* at 321 citing *In re Valley,* 21 B.R. 674 (Bankr.D.Mass.1982). In evaluating whether a false statement is material, a germane inquiry is "whether the lender would have made the loan had he known the debtor's true financial condition." *In re Bogstad,* 779 F.2d 370, 375 (7th Cir.1985). Clearly, had the Plaintiff had accurate financial information from the Debtor, not only would he have been reticent to proceed, the future of Advertising Plus would have been in doubt.

Finally, the issue of whether the Plaintiff reasonably relied on the representations of the Debtor regarding Advertising Plus' financial condition is straightforward.

The Court is directed to the particular facts and circumstances of the case. *First Bank v. Mullet* (In re Mullet), 817 F.2d 677, 679 (10th Cir.1987). Again, the Court must consider the totality of the circumstances. *In re Young,* 995 F.2d 547 (5th Cir.1993), *citing In re Coston,* 991 F.2d 257 (5th Cir.1993).

Here, the Parties started a corporate venture with each assigned responsibilities based on prior experience. The Debtor exercised virtually total control over the financial aspects of the business and solely provided the financial information to the accountants that formed the basis of the Plaintiff's comprehension of Advertising Plus' financial health. The Debtor, for as many as six years, bled Advertising Plus by taking excessive compensation via salary, checks drawn to cash and personal expenses paid and camouflaged as legitimate business expenses. Further, the Debtor knowingly submitted erroneous tax returns to the IRS and at least one bank for purposes of obtaining credit. Unlike the Debtor, the Plaintiff substantially adhered to the initial agreement between the Parties regarding compensation and benefits. The Plaintiff performed his assigned responsibilities and, when asked by the Debtor, provided his personal guarantee to support a related entity and loaned funds to Advertising Plus. This Court finds that the Plaintiff sustained his burden of proof that he reasonably relied on false representations by the Debtor which resulted in damage to the Plaintiff.

Therefore, it is the decision of this Court that certain debts of the Debtor owing to Advertising Plus and/or the Plaintiff are non-dischargeable. As already noted, at least $30,829.13 is owed to the Plaintiff individually for damages resulting from the litigation that was commenced against him relating to the equipment lease guarantee executed by the Plaintiff at the insistence of the Debtor. Additionally, the Debtor is liable to the Plaintiff for damages of $10,911 resulting from Plaintiff's May 1991 loan to Advertising Plus, which was not repaid or matched by the Debtor. The amount of $41,740.13 is thus non-dischargeable debt owing by the Debtor to the Plaintiff individually.

The Plaintiff has alleged that the Debtor is obligated in the amount of $225,701.17 to

Advertising Plus for personal expenses paid through the business that were beyond the scope of the agreement between the Parties. (*See, e.g.,* Joint Exhibits 29 and 68). The Court, however, has deducted from this sum an allowance of $9,656 to the Debtor for gasoline credit card purchases equal to that expensed by the Plaintiff during the six year period, plus $1,000 for fuel purchases related to business entertainment on the Debtor's boat.

This Court notes that the Plaintiff conceded to the allowance of $2,000 in business travel and entertainment expenses incurred by the Debtor and the Court will allow this sum as a separate deduction. The Court has already noted the Debtor's agreement that any credit card charges in the Debtor's wife's name, paid by Advertising Plus, were to be reimbursed to Advertising Plus.

This Court will not provide the Debtor with an allowance for car lease payments, related automotive insurance and repairs, together totalling $52,899.54. Likewise, this Court does not believe that the car telephone expense of $16,687.48 should be allowed, as all of these expenses appear to have been allocable to Roma pursuant to the initial agreement of the Parties.

Based upon the limited evidence presented, it appears that at inception, the Parties contemplated a monthly payment of $27 for the Debtor's life insurance. In accordance with this agreement, over the six years, there would have been $1,904 expended by Advertising Plus on insurance. This amount will be deemed an allowable expense. The exact amount intended by the Parties to be expended by Advertising Plus on health insurance cannot be determined from the testimony and evidence presented to this Court. As such, this Court has attributed one-half (½) of the remaining $21,643.98 as being part of the agreed benefit and thereby dischargeable. The balance of $10,821.99 is non-dischargeable.

The evidence presented indicates that over the six years there was $11,431.60 expended by Advertising Plus on the Debtor's liquor purchases. Again, based upon the limited evidence presented and this Court's acknowledgement of recognized business practice, an allowance of $5,715.80 is deemed an appropriate expense and the balance of $5,715.80 is deemed non-dischargeable.

Other expenses evidenced in Joint Exhibit 68 include $2,270 paid to Citibank Visa and $42,696.63 paid to American Express, *et al.* These expenses were not fully refuted by credible testimony and/or evidence. As such, once again, the Court is forced to consider the totality of the circumstances and determine that one-half (½) of the expenses may have been incurred for items or activities arguably related to the business. This Court has thus attributed one-half (½) of the $44,966.63 expensed by Advertising Plus for payment of Debtor's credit card obligation to an agreed benefit contemplated by the Parties. The remaining $22,483.31 is hereby deemed non-dischargeable.

The remaining expenses evidenced in Joint Exhibit 68 include $19,700 paid for Debtor's personal expenses; $9,133.75 paid for Debtor's income taxes; $552 paid for Debtor's medical bills; $18,417 paid to Debtor's housing contractors and $1,791.40 paid for Debtor's miscellaneous personal expenses. Based upon the testimony and evidence presented to this Court, and the Debtor's failure to substantiate any of these expenses, these expenses are deemed a non-dischargeable liability of the Debtor.

Summarizing the foregoing analysis, it is the holding of this Court that the personal expenses of the Debtor, paid by Advertising Plus, in the amount of $225,701.17, will be reduced by $53,581.10. This amount represents the dischargeable portion of the disputed expenses. As such, the amount of $172,120.07 is non-dischargeable debt owing by the Debtor to Advertising Plus on account of personal expenses paid on his behalf by Advertising Plus.

Moreover, in addition to the non-dischargeable liability for the Debtor's personal expenses, the Debtor is deemed liable for a non-dischargeable debt of $205,584, representing an overdraft of the net profits derived from the Roma account. (Joint Exhibit 71). The Debtor is further liable to Advertising Plus for the value of the furniture personally accepted by him in lieu of $10,804

that was due Advertising Plus from a related Roma account. This debt is likewise non-dischargeable. This Court will not address any funds allegedly due to Advertising Plus from Roma as this is beyond the scope of this proceeding. As such, the amount of $216,388 is non-dischargeable debt owing by the Debtor to Advertising Plus on account of salary/compensation overdraft.

Finally, the Parties should understand that where this Court has determined that certain debts of the Debtor are non-dischargeable and payable to Advertising Plus, those sums may be subject to claims by outside creditors, if any. Should any funds remain after settlement of such outside creditor's claim(s), the balance remaining shall be divided between the Parties as shareholders pursuant to their agreement.

### CONCLUSION

This Court has jurisdiction pursuant to 28 U.S.C. Sections 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(I).

Based upon the foregoing, this Court finds that the Plaintiff has sustained his burden of proving the elements set forth in Section 523(a)(2) and (a)(4) of the Code. To the extent that the burden of proof shifted to the Debtor under Section 523(a)(4), the Debtor has failed to meet his burden.

This Court finds that the $41,740.13 owing by the Debtor to the Plaintiff individually is non-dischargeable.

This Court further finds that the total of $388,508.07 owing by the Debtor to Advertising Plus is non-dischargeable.

Submit an Order in accordance with this Decision.