SPYDER ENTERPRISES,
INC., Plaintiff,

v.

Richard WARD, Defendant.

Civ. A. No. CV–92–5159.

United States District Court,
E.D. New York.

Jan. 4, 1995.

Robert N. Chan, Ferber Greilsheimer Chan & Essner, New York City, for plaintiff.

John N. Iannuzzi, Iannuzzi and Iannuzzi, New York City, for defendant.

*MEMORANDUM AND ORDER*

TRAGER, District Judge:

### Introduction

In this diversity action, plaintiff Spyder Enterprises, Inc. seeks to rescind its March 1990 purchase of a 1962 Lotus 24 Formula One vintage race car. Spyder is a corporation solely owned by its president, Everett Anton Singer. In his complaint, Singer alleged that the defendant, Richard Ward,

made fraudulent representations to him about the car's engine in order to induce the sale. Specifically, Singer alleged that he was led to believe that the car contained a particular engine, a rare and fragile piece of machinery, which is traditionally paired with the Lotus 24 chassis. When shortly after his purchase of the car, Singer discovered otherwise, he requested of Ward to rescind the contract of sale. Ward refused to unwind the transaction.

Following a bench trial, I reserved decision pending the examination of post-trial submissions. After reviewing the submissions, I now reaffirm my initial oral determination that the sale was fraudulently induced. I find that defendant Ward made affirmative fraudulent misrepresentations to Singer in order to induce him to purchase the car, and that plaintiff is entitled to the remedy of rescission.

### Facts

Grand Prix racing had its genesis with the establishment of a racing series in the first decade of this century. The first Grand Prix event took place in Le Mans, France in 1906. The organizers of the series created a "formula," or a list of parameters within which an event's and a race car's attributes must fall in order to qualify. These guidelines range from course distance and the number of qualifying events to a car's minimum weight requirements and maximum engine displacement. The formula was altered from time to time to accommodate developing automobile technology.

After World War II, the World Championship for Drivers was founded. It sanctioned a new series of racing events—"World Champion Formula One." The FIA, or the Federation Internationale de l'Automobile, the governing body for sanctioned Grand Prix events, administered the Championship and set the Formula One regulations. The first Formula One event was held in 1950, at Silverstone, England. Top finishers in FIA sanctioned Grand Prix events were awarded points. At the end of each racing season, the racer that had earned the most points in a set number of events was declared to be the World Driving Champion. The formula originally adopted for Formula One races set a maximum engine displacement of 1.5 liters. That cap remained in effect until 1966. Engines in excess of this maximum cylinder capacity were disqualified; races that accepted cars that violated Formula One parameters could not award points to the race's winners. These races were not considered to be official "Grand Prix" events. Pl.Exh. 14; Larry Edsall, *Some ABCs of Auto Racing,* Autoweek, Jan. 11, 1988, at 53; Cynthia Claes, *Those Numbing Numbers,* Autoweek, Dec. 17, 1990, at 86.

Uncontroverted expert testimony has already established that only twelve Lotus 24 automobiles were ever built and that only nine are known to still exist. R. of 5/9/94 at 84. They were always raced in Formula One events with either a 1.5 liter "BRM" engine, or a 1.45 liter Coventry Climax engine. *Id.* at 78–79. Throughout the history of Grand Prix Formula One racing, Lotus 24 automobiles were never paired with two liter engines of any make. *Id.* at 34–35, 80–81. By the time the displacement formula was relaxed by the FIA in 1966, the Lotus 24 had retired from the Formula One racing scene. *Id.* at 81.

Defendant has presented evidence that two liter engines could be "destroked," that is, such engines could be mechanically adapted to a lesser 1.5 liter displacement so that they could qualify for an FIA-sanctioned racing event. However, no evidence was offered at trial that any such adaptation was ever attempted with an engine appropriate to a Lotus 24 in an FIA-sanctioned Grand Prix event. It is true that after 1966 and, indeed, to this day, two liter engines are indeed paired with Lotus chasses in certain racing events. However, those events are nonsanctioned and otherwise known as vintage historical races. They are non-FIA; therefore, participation in these events could not earn the race winners legitimate points toward the Championship.

However, for Singer, a vintage car collector, historical racing is entirely beside the point. Singer collects vintage cars; he does not race them. Vintage car collectors are motivated to purchase an automobile by its provenance and its investment potential rather than by any points-winning capability.

Because throughout Formula One history a Lotus 24 chassis had never been paired with a two liter engine, the pairing of a Lotus 24 with a two liter BRM engine would seem to a serious collector to indicate an almost blasphemous contempt for the car's distinguished history. As only thirty-one 1.5 liter BRM engines and thirty-three Coventry Climax engines were ever manufactured, they are of tremendous historical significance to collectors of vintage racing machinery and memorabilia. R. of 5/9/94 at 91, 134.

Singer first learned that the Lotus 24 race car which is the subject of this action was for sale from an advertisement that Ward placed in the November 27, 1989, advertisement of *Autoweek*. It read as follows:

LOTUS TYPE 24/BRM Formula One, 1962—Chassis # 945 w/6–spd Colatti box, excellent original condition throughout, first class racing history, some spares, $300,000.

Singer testified that he had inquired about the engine paired with the Lotus in late November or early December of 1989. R. of 5/9/94 at 39–47. It is uncontested that the BRM engine that is now found in chassis number 945 has a two liter displacement and that it was manufactured sometime after the Lotus 24 had retired from Formula One competition in 1965.

Though defendant Ward testified that he never represented the engine to have a cylinder capacity of 1.5 liters, for the reasons set forth below, I do not credit his testimony. I find as a matter of fact that Singer had indeed been assured by Ward at that time that the engine was a historically appropriate 1.5 liter BRM model. I also find that this assurance was a material factor in Singer's decision to purchase the car.

Evidence abounds that Ward made an affirmative misrepresentation as to the engine's displacement. Singer's contemporaneous annotations on the *Autoweek* magazine page confirm that such a representation was actually made. Next to the Lotus advertisement, Singer had pencilled in his own hand. "vint. raced in UK 1.5 1. old wheels + new. 2 bodies—Dick Ward." Def.Exh. C. Singer has testified that he had made these notations in late November or early December of

1989, when he first spoke with Ward about the car. As noted above, Singer's writings on the page includes the notation "1.5 1." *i.e.,* that the engine in fact possessed a 1.5 liter displacement. Singer produced documentary evidence, in the form of his telephone bill that revealed that there were communications between Ward and himself as early as December of 1989. On December 10, 1989, only two weeks after the advertisement appeared in *Autoweek*, Singer telephoned Ward and spoke with him for twenty-six minutes. Pl.Exh. 19; R. of 5/11/94 at 30. Singer's writings were consistent both in format and in substance with his account of this telephone conversation. At one point, Ward's counsel implied that the notes might have been made after the event. Whatever slight possibility there was that this occurred is belied by defendant's false testimony that he never spoke to Singer until sometime in late February or early March of 1990. R. of 5/10/94 at 205. Singer's telephone records establish the falsity of Ward's claim. Moreover, given Singer's demonstrated regard for provenance, it is inconceivable that he would have discussed every feature of the Lotus with Ward save the engine. Therefore, on the basis of this evidence alone, I find Ward's version of the evidence not to be credible. Ward made an affirmative misrepresentation as to the cylinder capacity in December of 1989, three and one-half months prior to the date on which the parties contracted to sell the car.

This conclusion is reinforced by other circumstantial evidence. Sometime prior to the sale, Ward forwarded a 1984 Historic Sports Car Club Vehicle Identity Form ("H.S.C.C. Form") to Singer that designated the engine to be a 1.5 liter BRM that was manufactured in 1962, the same year as the Lotus 24 chassis. The form guaranteed the engine in the Lotus to be "to the original specifications for that chassis number." Pl.Exh. 2, at 4. Though Ward contends that he had sent the form after Singer entered into the sale, the facsimile "cover sheet" sent together with the H.S.C.C. Form evidences that the document was sent prior to the sale for the purpose of inducing Singer to purchase the car. R. of 5/10/94 at 229, 235.

The cover sheet, after noting the inclusion of a series of photographs of the Lotus in the facsimile transmission, reads in pertinent part: "Also I have enclosed the H.S.C.C. Identity Form ... Hope you like the car—let me know." Pl.Exh. 2, at 1. The language used by the defendant patently indicates that at the point in time at which the photographs and the H.S.C.C. Form were transmitted to Singer, an agreement between the two parties had not yet been reached. The words themselves imply that Singer had yet to be convinced that he should buy the car that he had long coveted.

Ward additionally warranted in the contract of sale that the engine was "proper and correct for the car." Pl.Exh. 4. The contract was executed on March 31, 1990 and Singer purchased the Lotus from Ward for $255,000.00.

These additional facts support the conclusion that Ward's version of the facts is not credible, and that Ward engaged in material misrepresentation in assuring Singer on at least one occasion prior to the sale that the engine had a 1.5 liter displacement. *In toto*, it is clear that Ward's actions amount to egregious and unquestionable misrepresentations, and that such misrepresentations were made prior to the sale.[1]

Soon after Singer took possession of the car on April 22, 1990, he dismantled the car in order to clean it. After taking apart the chassis, he discovered that the serial number of the engine did not comport with the serial number listed on the H.S.C.C. Form. Further investigation and several consultations confirmed his suspicion that the BRM engine had a maximum cylinder capacity of two thousand cubic centimeters, or two liters.

Exactly one month after Singer took possession of the car, he requested that Ward take it back and refund the sums advanced to him. Ward refused, and Singer filed the instant action. Singer also entered into negotiation with a potential third-party purchaser in an attempt to limit his exposure. Those deliberations never progressed beyond nascency. Def.Exhs. E–HH.

In summary, I make the following findings of fact:

First, because of Singer's status as a collector and his particular concern with provenance, there is no reason to doubt his claim that Ward had specifically assured him in the 26 minute conversation on December 10, 1989 that the car contained a 1.5 BRM liter engine, one of only two models of engine that would be considered historically appropriate for the car, given the Lotus 24's documented racing record.

---

1. In his post-trial submissions, defendant questions whether his affirmative assurances in the advertisement, the H.S.C.C. form, and the warranty in the contract of sale even amounted to a misrepresentation. Ward contends that his documented representations are at worst ambiguous and as such cannot possibly amount to the degree of affirmative conduct required to maintain a fraud action. He notes that Lotus 24 chassis run splendidly when paired with two liter engines, and that, therefore, these more durable engines are "proper and correct,"; the phrase "excellent original condition throughout" is said to make reference to the chassis only.

Defendant maintains that this ambiguity translates at worst into an instance of nondisclosure. Even accepting this at face value, and putting aside for a moment my finding that Ward indeed affirmatively represented orally to Singer that the engine possessed a 1.5 liter displacement, New York law recognizes that where a duty to make a disclosure is ignored, or in certain instances where the nondisclosure is calculated to induce a false belief, such nondisclosure is tantamount to affirmative misrepresentation. *Minpeco v. Conticommodity Services, Inc.*, 552 F.Supp. 332

(S.D.N.Y.1982); *Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978); *Capitaland United Soccer Club, Inc., et al. v. Capital District Sports and Entertainment Inc., et al.*, 199 A.D.2d 626, 604 N.Y.S.2d 998 (1993).

Ward's calculatedly equivocal attempt not to prevaricate nudged the plaintiff towards deducing what could not legally be said. Once Ward made reference to the engine in an advertisement that read "excellent condition throughout," and once he warrantied the engine to be "proper and correct" for a Lotus 24, he was bound to divulge the not-quite-appropriate pairing of chassis and engine. Ward admitted he knew that Signer's interest in the car was as a dealer and collector, not a racer. R. of 5/10/94 at 206. Even failing to include Ward's oral misrepresentation to Singer in the equation, such evasion even standing on its own is a touch too artful to be pigeonholed within the rubric of nondisclosure. Conversely, had Ward been under the impression that Singer intended to race the car, perhaps then his failure to disclose the engine's proper displacement would not have been quite as objectionable.

Second, as noted above, contrary to Ward's testimony before this court, the H.S.C.C. Form was forwarded to Singer prior to the sale and represented the engine to be other than it actually was, namely that it described the engine to be "to the original specification for [a Lotus 24]," and noted the serial number to be other than the number on the engine which Singer actually purchased.

Third, the actual engine purchased from Ward has a displacement in excess of 1.5 liters.

Fourth, Singer was not on notice of the deception until after the sale was consummated.

Fifth, an original 1.5 liter engine is significantly more valuable in the collector's market than a two liter engine—even one that has been sleeved down to a 1.5 liter displacement.

Sixth, Singer was a collector and did not wish to purchase the car for racing purposes and, therefore, the car's provenance was highly material to him. Singer relied on his misapprehension to his detriment, for he would not have purchased the Lotus had he been aware that it contained a two liter engine. Even had the engine been sleeved down to a proper 1.5 liter displacement prior to the sale, Singer would not have chosen to purchase the automobile, and certainly not for the price he paid.

**Discussion**

■ According to New York law, in order to prevail in a fraud suit, a plaintiff must establish that: (1) a false representation was made as to a material fact; (2) the defendant knew the representation to be false; (3) the representation was calculated to induce reliance; (4) plaintiff indeed relied on such representation unaware of its falsity; and (5) plaintiff was injured by his or her reliance upon that representation. *Kregos v. Associated Press*, 3 F.3d 656 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40 (2d Cir.1991); *Banque Arabe et Internationale d'Investissement v. Md. Ntl. Bank*, 850 F.Supp. 1199, 1215 (S.D.N.Y.1994); *P. Chimento v. Banco Popu-*

*lar de Puerto Rico,* —— A.D.2d ——, 617 N.Y.S.2d 157 (App.Div.1994); *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186 (1980). My findings of fact reveal that Singer has met his burden of establishing each of these elements.

Ward, aside from disputing the finding of affirmative misrepresentation, also advances a number of legal defenses in his post-trial submissions. First, he argues that the doctrine of *caveat emptor* bars Singer from relief, as Singer should not have justifiably relied upon the information given to him by Ward, and that Singer should have instead conducted his own investigation into the car's condition and its history. Additionally, Ward argues that Singer had not timely rescinded the contract of sale, and even had the contract been timely rescinded, evidence of ongoing negotiations between Singer and a potential purchaser evidenced an intent to reaffirm the contract.

**I. *Caveat Emptor***

■ Ward asserts the doctrine of *caveat emptor* precludes Singer from relief, as Singer was required to perform his own inquiry into the condition of the car. He argues that the serial number on the H.S.C.C. Form, both in that the number differed from the serial number of the engine that Singer purchased and due to the fact that the serial number on the form was prefixed "123," should have put Singer on notice that further investigation was required. Such investigation would have revealed that series 123 BRM engines are of the two liter variety. Ward also argues that, as evidence of the engine's proper displacement was equally available to both parties, Ward could not be held liable for misrepresenting the cylinder capacity of the engine.

It should first be noted that a defendant is required to raise any affirmative defenses in its pleadings, and as defendant Ward has not asserted the doctrine of *caveat emptor* at the pleading stage of this action, he is likely barred from availing himself of the defense at this time. Fed.R.Civ.P. 8(c); *Doubleday & Co. v. Curtis,* 763 F.2d 495, 503 (2d Cir. 1985). *cert. dismissed,* 474 U.S. 912, 106 S.Ct. 282, 88 L.Ed.2d 247 (1985). But even

were the issue open, Ward is substantively barred from asserting this defense. It has already been established that Ward actively engaged in material misrepresentation. The doctrine of *caveat emptor* will not relieve a defendant who has engaged in such conduct from liability for fraud, for "[i]t is no excuse for a culpable misrepresentation that a means of probing it were at hand." *Albert v. Title Guarantee & Trust Co.*, 277 N.Y. 421, 14 N.E.2d 625 (1938).

Alternately, it should be noted that the defendant warranted in the contract of sale that the engine was "proper and correct for the car." Express warranties will be imputed from oral assurances. Ward also twice warranted the engine to be a 1.5 liter BRM—orally and in the H.S.C.C. Form that he sent to Singer prior to the sale. Warranties are "intended precisely to relieve the promisee of any duty to ascertain the fact for himself." *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir.1946) (Hand, J.).[2] For this reason alone Ward may not rely on the *caveat emptor* defense. In the face of defendant's representations, plaintiff was not required to hire an expert to verify Ward's warranties.

Furthermore, Ward's argument that the engine's serial number should have placed a buyer on notice of the car's displacement is of no avail to him. Defendant concedes that no one could have been able to determine what the engine's serial number was unless the car was first dismantled. R. of 5/10/94 at 143; R. of 5/9/94 at 70. Singer did not disassemble the car prior to purchasing it and, therefore, the serial number cannot be characterized by Ward as information equally available to both buyer and seller. Accordingly for this reason, defendant's argument is similarly without merit.

### II. *Rescission and Reaffirmation*

■ A party seeking to rescind a contract must do so promptly once that party becomes cognizant of its breach. Once on no-

tice, the party is afforded a reasonable period of time within which to decide whether to disaffirm the contract. *Allen*, 945 F.2d at 47; *Banque Arabe*, 850 F.Supp. at 1211. Ward maintains that Singer had not timely rescinded, and that even were it determined that he did, he reaffirmed the contract by later offering the car for sale.

Thirty-one days after the transaction was concluded, Singer wrote Ward as follows:

I would like you to take back the car and refund the monies in full.

The above language is abundantly decisive to premise a claim for rescission.

■ Ward is also procedurally barred from contending that Singer reaffirmed the voided contract by engaging in ongoing negotiations to sell the car to a third party after Ward refused to unravel the transaction. Ward never asserted a ratification defense in his pleadings, and as that is an affirmative defense, he was bound to have given notice of his intention to assert this defense in his pleadings. Fed.R.Civ.P. 8(c); *Banque Arabe*, 850 F.Supp. at 1213.

■ I additionally find that even had Ward complied with the notice requirement of the Federal Rules such that the reaffirmation issue was properly before this court, he substantively failed to meet his burden of proving intentional ratification at trial. *Id.* Singer unequivocally expressed his desire to rescind; when faced with Ward's recalcitrance, he attempted to mitigate the disaster by probing his options. He spoke with a single prospective purchaser. Singer sought judicial recourse only after negotiations with that individual fell through. Singer ought not be penalized for resorting to self-help in order to avoid the delay and expense of a judicial proceeding to enforce his rights as a fraud victim. His actions in this instance are laudable; indeed, had the prospective buyer agreed to purchase the car, that might also have well rescued Ward from having to defend this action.

---

**2.** An oral representation about the condition of an engine made by a seller who was neither a dealer nor a mechanic was deemed to be an express warranty in a case where the engine defect was patently obvious. *Ekizian v. Capurro,* 111 Misc.2d 372, 444 N.Y.S.2d 361 (Justice Ct.1981); *see also Dorneles v. Carpenito*, 137 Misc.2d 469, 521 N.Y.S.2d 967 (Yonkers City Ct.1987).

**14**

Singer's conduct in discussing with a single individual the option of selling him the car simply does not evidence an intent to reaffirm the contract. Had the negotiations matured beyond infancy, had they flourished to the point of a meeting of the minds, then perhaps a case could be made that Singer indeed "accept[ed] benefits flowing from the contract" by engaging in speculation, or that he acted in some other fashion inconsistent with [the] exercise of a right to rescind. *Prudential Ins. Co. of America v. BMC Indus.*, 630 F.Supp. 1298, 1300 (S.D.N.Y.1986); *Tibbetts Contracting Corporation v. O & E Contracting Investment Company, et al.*, 15 N.Y.2d 324, 258 N.Y.S.2d 400, 206 N.E.2d 340 (1965); *Brennan v. National Equitable Investment Company*, 247 N.Y. 486, 160 N.E. 924 (1928). But that is not the case before this court.

### III. *Prejudgment Interest*

 In this diversity action, the court must apply New York law to the question of prejudgment interest on contract claims based upon New York State law. *Trademark Research Corporation v. Maxwell Online Inc.*, 995 F.2d 326, 341–42 (2d Cir.1993). New York law provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y.Civ.Prac.L. & R. 5001(a) (McKinney 1992).

It is now four years after the sale was consummated. The market value of the Lotus 24 is now little more than half of what it was in 1990. R. of 5/9/94 at 132–33, 145–46. Some equities may lie on the defendant's favor on the issue of prejudgment interest given this steep decline in value. Had Ward chosen to sell the car in 1990 and disclosed the true facts about the engine to the purchaser, he probably would have been able to sell the car for more than its present value. On the other hand, as a result of Ward's actions, plaintiff lost the use of his money for

almost four years. In light of Ward's demonstrably false testimony before this court, I see no justification for considering any equities in his favor. Accordingly, plaintiff's demand for prejudgment interest is granted.

### Conclusion

For the foregoing reasons, I hereby find for the plaintiff on its action for rescission. Plaintiff's application for prejudgment interest is granted. Plaintiff is directed to submit a proposed judgment, on notice, in accordance with this opinion.