*909 OPINION OF THE COURT
Kenneth R. Fisher, J.
This is a dispute involving former 50% shareholders of a close corporation, Ajettix Incorporated. Plaintiffs commenced this action seeking legal and equitable relief for breach of fiduciary duty and fraud in connection with the agreement of Ajettix to redeem the stock owned by its vice-president and secretary, James D. Raub. Ajettix’s agreement to redeem.the stock for approximately $500,000 was guaranteed by the other shareholder, Ajettix’s president and treasurer Sue E. Newhouse. The action rests upon the allegation that defendant failed to disclose in conjunction with that transaction that he had been negotiating with a competitor (Croop-LaFrance, Inc.) to finance a buyout of plaintiff and that, during those negotiations, he gave the competitor confidential proprietary information of Ajettix. Plaintiffs have moved for summary judgment on their claim for equitable relief, seeking judgment as a matter of law rescinding the transaction on the ground of breach of fiduciary duty. Defendant has moved simultaneously for summary judgment dismissing the complaint in its entirety and reimbursing him his legal fees in accordance with the terms of the guarantee. The motions are supported by a joint submission of the deposition testimony, as well as separate affidavits.
The court concludes that plaintiffs have established their entitlement to judgment as a matter of law on their claim for rescission and that there are no issues of fact regarding defendant’s breach of the fiduciary duty defendant owed to the corporation in connection with this transaction. The court therefore grants plaintiffs’ motion and denies that part of defendant’s motion seeking summary judgment dismissing the claim for breach of fiduciary duty. Additionally, the court denies that part of defendant’s motion seeking summary judgment dismissing the fraud claims. Because the court grants plaintiffs’ motion and rescinds the transaction, the court also denies that part of defendant’s motion seeking legal fees under the guarantee.
I.
For the purpose of this decision only, the following facts are assumed. Ajettix is a software development company formed by plaintiff and defendant in 1994 and it is in direct competition with Croop. In June 2001, growing animosity between plaintiff and defendant led to discussions between those parties concern *910 ing the redemption of plaintiffs stock in Ajettix or the liquidation of the corporation. During those discussions, agreement could not be reached regarding the company’s fair market value, so defendant told plaintiff that “I would investigate selling the business as a going concern to a third party to ascertain its fair market value” (defendant’s affidavit 1f 23 [Dec. 21, 2004]).
Thereafter, without telling plaintiff, defendant arranged a meeting for June 19, 2001 with John Smith, the president of Brite Computers and a person with broad experience in acquiring companies, to seek assistance in determining Ajettix’s fair market value. In anticipation of that meeting, defendant obtained confidential proprietary information that he felt would be relevant on that issue, including “a list of inventory, a schedule of employees and their customers, the customer’s contact information, and a schedule of Ajettix employees, their pay rates and billing rates, Ajettix financial statements and Ajettix marketing material” (Leclair’s affidavit H 13 [June 25, 2004]). He obtained that information from Ed Hanchett, Ajettix’s director of finance, after telling Hanchett only that he was “going to speak to an investor” (defendant’s examination before trial [EBT] at 256). Also in advance of that meeting, defendant had his personal attorney, not corporate counsel, prepare a nondisclosure agreement (NDA).
Before any discussions took place at the meeting, defendant signed the nondisclosure agreement as vice-president of Ajettix, and John Smith signed the agreement as president of Brite, thereby binding Brite, as well as its “employees, consultants and professional advisors . . . [to] hold . . . [Ajettix’s proprietary] information confidential” (nondisclosure agreement If 2 [June 19, 2001]). After the agreement was signed, John Smith invited his son Justin Smith and his brother Jim Smith into the meeting where they, along with John Smith, were given the confidential proprietary information.
During the course of the meeting, defendant became aware that Justin Smith was affiliated with Brite and that Jim Smith was a part owner of Croop, which is located in the same building as Brite. Unbeknownst to defendant at the time, John Smith also was a principal of Croop.[1] Defendant did not require Justin or Jim Smith to sign the nondisclosure agreement because de *911 fendant believed that they were bound by the agreement as employees or consultants of Brite.
The focus of the meeting, which had been called to valúate Ajettix, changed when John Smith indicated a desire to become an investor in Ajettix. After extended discussion, the participants in the meeting agreed in principal that Brite would finance defendant’s purchase of plaintiffs share of Ajettix and thereafter “the Smiths would acquire majority ownership of Ajettix” (defendant’s affidavit 1Í 28 [Dec. 21, 2004]). The plan anticipated not only defendant’s continued employment with Ajettix, but also the continued employment of all the current employees of Ajettix.
Following the meeting, defendant entered into negotiations with plaintiff to purchase plaintiffs share of Ajettix. Although an agreement was reached regarding a selling price, there was continuing disagreement about certain details, and the transaction did not close as scheduled on July 13, 2001. At no time during those negotiations did defendant reveal his dealings with the Smiths.
Shortly thereafter, defendant decided against purchasing plaintiffs shares and determined instead to sell his shares and, no later than July 16, 2001, he informed the Smiths about his change of mind. Upon learning of defendant’s decision, the Smiths “either returned to [defendant] or destroyed the Ajettix documents [defendant] had provided to them” (defendant’s affidavit 11 35 [Dec. 21, 2004]). At a meeting on July 16, 2001, plaintiff, on behalf of the corporation, accepted the offer of defendant to sell his shares for approximately $500,000.
The transaction was finally consummated on July 20, 2001. As part of that transaction, plaintiff signed a promissory note as president of Ajettix obligating Ajettix to pay defendant the sum of approximately $500,000 to redeem defendant’s stock in the company. The note was secured by plaintiffs personal guarantee. Plaintiff also signed general releases on behalf of herself and Ajettix.
Prior to closing the deal, defendant did not tell plaintiff about the previous meeting with the Smiths, the agreement reached at that meeting, or the release of confidential proprietary information. Nor did he tell plaintiff about the nondisclosure agreement, even though he signed that agreement on behalf of Ajettix. At best, some time around July 16th, defendant told only Dave Madison, a member of the management committee of Ajettix, that “[he] had turned down an offer to sell the business” *912 (defendant’s EBT at 281). When asked by Hanchett prior to July 20th[2] “who this offer had come from,” defendant declined to answer, believing that disclosure of that information was unnecessary due to the “NDA” (defendant’s EBT at 281; see defendant’s affidavit 1Í 38 [Dec. 21, 2004]). Plaintiff did not discover Smiths’ involvement until sometime after completion of the transaction.
II.
In moving for summary judgment on their claim for rescission, plaintiffs contend that defendant breached a fiduciary duty by failing to disclose, prior to the July 20th transaction, his dealings with the Smiths. Defendant contends that his fiduciary duty encompassed only the obligation to avoid self-dealing and that, in any event, there was no fiduciary relationship with respect to the July 20th transaction because his relationship with plaintiff was hostile and their dealings at arm’s length.
The law clearly supports plaintiffs’ contention. Defendant’s fiduciary obligations to Ajettix arose from the status of defendant as a corporate officer and director (see Alpert v 28 Williams St. Corp., 63 NY2d 557, 568 [1984], rearg denied 64 NY2d 1041 [1985]; Jacobson v Brooklyn Lbr. Co., 184 NY 152, 162 [1906]; Busino v Meachem, 270 AD2d 606, 609 [2000]) and were not extinguished by his acrimonious relationship with plaintiff so long as defendant did not withdraw from the corporation (see Fender v Prescott, 101 AD2d 418, 423 [1984], affd 64 NY2d 1077 [1985]; see also Blue Chip Emerald v Allied Partners, 299 AD2d 278, 279 [2002]). Beyond that, the “relationship between shareholders in a close corporation, vis-á-vis each other, is akin to that between partners and imposes a high degree of fidelity and good faith” (Fender, 101 AD2d at 422; see Brunetti v Musallam, 11 AD3d 280, 281 [2004]). Even on dissolution, partners owe a continuing fiduciary duty to one another with respect to dealings effecting the winding up of the partnership and the preservation of the partnership assets (see generally 15A NY Jur 2d, Business Relationships § 1465; see Matter of Silverberg, 81 AD2d 640, 641 [1981]; Old Harbor Native Corp. v Afognak Joint Venture, 30 P3d 101, 106 [Sup Ct, Alaska 2001]; Ebker v Tan Jay Intl. Ltd., 741 F Supp 448, 469 [US Dist Ct, SD NY 1990], affd 930 F2d 909 [1991], cert denied 502 US 853 [1991], reh denied 502 US 1000 [1991]). Thus, despite the acrimony *913 here, defendant continued to owe a fiduciary duty to plaintiff with respect to a transaction involving the redemption of his shares of the corporation (cf. Matter of Ronan Paint Corp., 98 AD2d 413, 421 [1984]). The court therefore concludes that defendant’s fiduciary obligations to the corporation and plaintiff personally continued until the July 20th transaction closed (see Blue Chip, 299 AD2d at 279; Fender, 101 AD2d at 423).
The court rejects the contention of defendant that his fiduciary duty encompassed only an obligation to avoid self-dealing.
“[A] fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. This is a sensitive and ‘inflexible’ rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary’s personal interest possibly conflicts with the interest of those owed a fiduciary duty” (Birnbaum v Birnbaum, 73 NY2d 461, 466 [1989] [citations omitted], rearg denied 74 NY2d 843 [1989]).
Thus, there is an obligation of utmost candor (see Alpert, 63 NY2d at 569; Kavanaugh v Kavanaugh Knitting Co., 226 NY 185, 193 [1919]), strictly obligating a fiduciary “to make a full disclosure of any and all material facts within his or her knowledge relating to a contemplated transaction with the other party to the relationship” (60A NY Jur 2d, Fraud and Deceit § 99). “[W]hen a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make ‘full disclosure’ of all material facts” (Blue Chip, 299 AD2d at 279, quoting Birnbaum, 73 NY2d at 466; see Arlinghaus v Ritenour, 622 F2d 629, 636-637 [2d Cir 1980], cert denied 449 US 1013 [1980]; 3A Fletcher, Cyclopedia of the Law of Private Corporations § 1171 [1931]).
The transaction here, without question, concerned a matter relating to defendant’s fiduciary relationship with plaintiffs. Defendant, therefore, was obligated in negotiating that transaction “to disclose any information that could reasonably bear on plaintiffs’ consideration of [his] offer” (Dubbs v Stribling & Assoc., 96 NY2d 337, 341 [2001]). Stated another way, defendant was “under a duty to disclose . . . the full facts . . . affecting the value of the stock which [he] was selling” (Saville v Sweet, 234 App Div 236, 238 [1932], affd 262 NY 567 [1933]). “Absent such full disclosure, the transaction is voidable” (Blue Chip, 299 AD2d at 279-280; see Birnbaum v Birnbaum, 117 AD2d 409, 416 [1986]). Indeed, where a fiduciary relationship exists *914 between the parties, there must be clear proof of the integrity and fairness of a transaction between them, “ ‘or any instrument thus obtained will be set aside or held as invalid’ ” (Matter of Gordon v Bialystoker Ctr. & Bikur Cholim, 45 NY2d 692, 698 [1978], quoting Ten Eyck v Whitbeck, 156 NY 341, 353 [1898]).
Defendant contends that full disclosure of his dealings with the Smiths was unnecessary because the release of confidential proprietary information to them was limited to those documents essential and necessary to valuing his stock and the corporation was protected by a nondisclosure agreement. The issue here, however, is not whether defendant breached his fiduciary duty by contacting the Smiths and releasing confidential proprietary information to them (cf. Leviton Mfg. Co. v Blumberg, 242 AD2d 205, 208 [1997]). The issue is whether defendant’s obligation of full disclosure included the obligation to disclose everything about his dealings with the Smiths, including the fact that he released confidential proprietary information to them under a nondisclosure agreement.
Defendant also challenges the materiality of that information in light of the nondisclosure agreement. Again, however, defendant misses the point. The point is that the value of a corporation is affected by the release of its confidential proprietary information to persons associated with a competitor and, while a nondisclosure agreement may diminish that effect, or eliminate it entirely, there is no way for the corporation or a shareholder like plaintiff to make that determination without knowledge of the agreement and an opportunity to review it. Given the fiduciary relationship that existed, it was the obligation of defendant to disclose everything about his dealings with the Smiths, including the fact that he released confidential proprietary information to them under a nondisclosure agreement, because “that information could reasonably bear on plaintiffs’ consideration of [defendant’s] offer” (Dubbs, 96 NY2d at 341). Additionally, defendant entered into the nondisclosure agreement on behalf of the corporation. That agreement was a corporate document that he had no right to withhold from plaintiffs.
Defendant nevertheless contends that he had no duty to disclose because he had no reason “to believe that the information [was] material and germane to [the] contemplated transaction” (Botti v Russell, 180 AD2d 947, 950 [1992]). In support of that contention, defendant cites evidence indicating he had no reason to believe that plaintiff harbored any enmity for the Smiths. *915 The relevant question, however, is not whether defendant had any reason to believe that there was any enmity but whether he had any reason to believe that one or more of the persons to whom he released confidential proprietary information were associated with a competitor of Ajettix. Defendant admits such knowledge and thus it is irrelevant whether he had any reason to believe that plaintiff harbored any enmity for the Smiths.
Equally irrelevant to the question at hand is defendant’s additional contention that proof of scienter is lacking. Because plaintiffs seek on their motion rescission and not damages, “proof of scienter is not necessary; even an innocent misrepresentation is sufficient for rescission” (Steen v Bump, 233 AD2d 583, 584 [1996], lv denied 89 NY2d 808 [1997]).
Finally, the court rejects defendant’s contention that plaintiffs’ claim for rescission is barred by the releases signed in conjunction with the July 20th transaction. “[A] fiduciary cannot by contract relieve itself of the fiduciary obligation of full disclosure by withholding the very information the beneficiary needs in order to make a reasoned judgment whether to agree to the proposed contract” (Blue Chip, 299 AD2d at 280; see H.W. Collections v Kolber, 256 AD2d 240, 241 [1998]). The court therefore concludes that plaintiffs’ motion should be granted because, upon all the papers and proof submitted, the claim for rescission based on the defendant’s breach of fiduciary duty in connection with the July 20th transaction has been established as a matter of law {see CPLR 3213 [b]).[3]
III.
The court next examines plaintiffs’ fraud claims. The complaint states claims for actual and constructive fraud in connection with the July 20th transaction. The claim of actual fraud rests upon the allegation that defendant intentionally concealed his dealings with the Smiths. The claim of constructive fraud is based on the allegation that defendant breached a fiduciary duty by failing to disclose those dealings.
In order to make out a prima facie case of fraud, it must be shown that there was a misrepresentation of a material fact by the defendant, done for a fraudulent intent, and justifiably relied upon by the plaintiffs to their detriment. In other words, *916 there must be proof “of a representation of material fact, falsity, scienter, reliance and injury” (Small v Lorillard Tobacco Co., 94 NY2d 43, 57 [1999]). “A fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information” (Standish-Parkin v Lorillard Tobacco Co., 12 AD3d 301, 303 [2004]). “Thus, where a fiduciary relationship exists, ‘the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive’ ” (Kaufman v Cohen, 307 AD2d 113, 120 [2003], quoting Whitney Holdings, Ltd. v Givotovsky, 988 F Supp 732, 748 [US Dist Ct, SD NY 1997]).
Constructive fraud is similar to fraudulent concealment except that the element of scienter need not be proven (Klembczyk v DiNardo, 265 AD2d 934, 936 [1999]). “[T]he element[ ] of scienter ... is dropped and is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship” (Brown v Lockwood, 76 AD2d 721, 731 [1980] [citations omitted]). Thus, constructive fraud refers to “ ‘an act done or omitted, not with actual design to perpetrate positive fraud or injury upon other persons, but which, nevertheless, amounts to positive fraud, or is construed as a fraud by the court because of its detrimental effect upon public interests and public or private confidence’ ” (Bank v Board of Educ. of City of N.Y., 305 NY 119, 123 [1953], quoting Eaton, Equity § 125).
Here, defendant established in support of his motion that he did not act with fraudulent intent. His evidence indicates that his dealings with the Smiths were for a legitimate purpose and that, although he intentionally refused to disclose those dealings to plaintiffs, his intent was not fraudulent but the product of a mistaken belief that disclosure was unnecessary due to the nondisclosure agreement. In response, plaintiffs cite evidence indicating that defendant was aware of plaintiff’s enmity toward the Smiths and her reluctance to deal with them. Although this evidence was of no moment to the breach of fiduciary duty claim, since scienter was not required, it is relevant here. Notwithstanding the fact that defendant refutes plaintiff’s proof, the conflicting affidavits on the issue of whether defendant was aware of plaintiffs enmity toward the Smiths creates an issue of fact on the requisite element of scienter, thereby precluding summary judgment in favor of defendant dismissing the actual fraud claim against him.
On the constructive fraud claim, as already indicated, proof of scienter is unnecessary. The same evidence already discussed *917 with reference to the breach of fiduciary claim also establishes the constructive fraud claim as a matter of law. Although defendant contends that requisite proof of injury is lacking, it appears that, if nothing else, the transaction itself is the damage flowing from the fraud. The court rejects defendant’s additional contention that the fraud claims are not pleaded with requisite specificity (see CPLR 3016). The court therefore denies defendant’s motion in its entirety.
On Subsequent Motion to Set the Terms of the Rescission Decree
Following the court’s decision and order granting plaintiffs motion for summary judgment declaring that there are no issues of fact concerning defendant’s breach of fiduciary duty in connection with the stock redemption and that plaintiffs are entitled to rescission, plaintiff now moves for summary judgment setting forth the terms of rescission. Plaintiff proposes an equitable decree of rescission which contains the following general terms:
“(1) Voiding the stock redemption transaction, including the Ajettix Incorporated Partnership Dissolution Agreement of July 17, 2001, the closing [agreement], the promissory note dated July 20, 2001, plaintiff’s general releases to defendant of July 20th, and the Guarantee Agreement of that date;
“(2) Restitution for the full $410,000 paid by plaintiff for defendant’s shares in the corporation as follows: $310,000 already paid to defendant under the terms of the promissory note with interest from the date of payment; and $100,000 paid by plaintiff into escrow since the action was commenced pursuant to the escrow order filed June 25, 2004, together with interest earned; and
“(3) Restoration to defendant in the form of a declaration that defendant is entitled to an interest in Ajettix Inc. that is the lesser of either (a) the liquidation value of 50% of Ajettix stock as of the date the final judgment is entered, or (b) a value in stock of Ajettix that is no greater than the liquidation value of defendant’s shares in Ajettix as of June 30, 2001, when the closing agreement became effective.”
Thus, plaintiff seeks, in that part of the equitable decree directing restoration, to insulate herself from any equitable adjust *918 ment by reason of depreciation of the stock, if depreciation occurred, and, at the same time, preserve to her the entire benefit of any appreciation of the stock since the redemption.
Plaintiff reasons that defendant should suffer losses occasioned by the decrease in value of the stock after the rescinded transaction by reason of his misconduct, citing Spyder Enters., Inc. v Ward (872 F Supp 8 [ED NY 1995]; 2 Robert Haig, Commercial Litigation in New York State Courts § 9:24, at 539 [2d ed 2005] [discussing Spyder Enters.]; 2 Dobbs, Remedies: Damages, Equity, Restitution § 9.3 [3] [2d ed 1993]). Furthermore, plaintiff maintains, the court cannot direct restoration to defendant of his previously owned 50% shares if the shares have appreciated since the 2001 redemption, because defendant “should not recover a windfall.” Newhouse insists that any appreciation of the company since the redemption occurred entirely through her efforts as 100% sole shareholder. Under either of plaintiffs proposed scenarios, defendant does not receive Ajettix stock and Newhouse remains sole shareholder; defendant only receives “liquidation value,” as of 2001 in the case of increased value of the shares, or as of the time of final judgment in the case of decreased value.
Not surprisingly, defendant vigorously objects to this formulation. First, defendant contends that true rescission in specie (i.e., money paid in return for 50% of the shares) cannot alone be ordered because that would not restore the parties to the status quo ante. Second, defendant acknowledges that, despite the impossibility of restoring the parties to the precontract status quo, rescission is otherwise appropriate and the court may fashion an equitable decree with appropriate adjustments. Third, defendant maintains that an adjustment is necessary because Newhouse “persuasively mismanaged” the corporation after she acquired his shares in the redemption, in that she failed to hire someone after his departure with his skill level to continue profitability. Fourth, the required adjustment cannot be determined until a valuation is had after appropriate discovery of postredemption corporate affairs. Fifth, restoration of the shares is required, even with adjustments, and that once he receives restoration of the shares he has rights under the Business Corporation Law “to vote on whether to pursue liquidation or, in the alternative, pursue its sale as a going concern” instead of “forcing” defendant “to accept a valuation based on a fictitious liquidation.” Defendant thus contends that an equitable decree of rescission entered only after an account *919 ing revealing the valuation in 2001, and now, would deprive him of his rights under the Business Corporation Law. Finally, defendant objects to an order voiding the releases each plaintiff signed at the July 2001 closing on the ground, which seemingly is at variance with his position on the prior motion, that they concern a Microsoft license upgrade transaction that is entirely separate from the stock redemption transaction.
Is an Equitable Decree of Rescission Appropriate?
A plaintiff who sues for rescission and also seeks damages for fraud may plead these inconsistent causes of action (CPLR 3002), but must eventually elect her remedy (Vitale v Coyne Realty, 66 AD2d 562, 563 [4th Dept 1979] [per curiam]; see 66 AD2d at 564, 568 [Callahan, J., dissenting on other grounds]). Plaintiffs impliedly elected their remedy when they moved for summary judgment declaring their entitlement to rescission, and they now confirm their election with this motion, styled as one under CPLR 3002 (e) and 3212 (e). While ordinarily “[t]he choice of remedy for damages and rescission lies ‘with the sound judgment and discretion of the trial court,’ ” and “should be determined by the Trial Judge in light of the record as it develops” (Vitale, 66 AD2d at 568 [Callahan, J., dissenting]; see also, Ungewitter v Toch, 31 AD2d 583, 584 [3d Dept 1968], affd 26 NY2d 687 [1970]), the court must respect the election of equitable rescission even though “we might well find rescission impossible,” when the parties are in agreement as to its propriety, albeit not in the degree of adjustments that may be necessary. (Vitale, 66 AD2d at 563 [majority op]; 66 AD2d at 568 [Callahan, J., dissenting]; compare Davenport v Martin, 294 AD2d 891, 891-892 [4th Dept 2002] [where the Court held that its discretion concerning the remedy chosen cannot be used to force an unwanted remedy upon the plaintiff], appeal after remand 4 AD3d 873 [4th Dept 2004].)
Defendant on this motion does not object to rescission, indeed he embraces it, but only upon such conditions as the court, in equity, deems just. This is in accord with the case law, which holds that plaintiffs’ tender of the stock certificates may not in the circumstances “exhaust the measure of [their] duty.” (Marr v Tumulty, 256 NY 15, 22 [1931, Cardozo, Ch. J.].) When plaintiff elects equitable rescission, as opposed to “at law upon the basis of a rescission already effectively declared,” plaintiff is only entitled “to procure the declaration of a rescission on whatever terms may be just.” (Id. [“(s)uitable conditions maybe imposed by the decree”]; see Buffalo Bldrs. Supply Co. v Reeb, 247 NY *920 170, 175-176 [1928]; Schank v Schuchman, 212 NY 352, 360 [1914, Cardozo, J.] [“in determining the extent to which changed conditions may relieve from the duty of restoration, (the court) must weigh the equities of each case, and exact such conditions of reimbursement or allowance as just dealing demands”]; Vitale, 66 AD2d at 568-569.) Accordingly, as defendants contend, “[t]he plaintiffs, by seeking to set aside the [stock redemption transaction], have elected to adopt all the consequences of rescission.” (Thomas v Beals, 154 Mass 51, 55, 27 NE 1004, 1005 [1891, Holmes, J.], cited in Marr v Tumulty, 256 NY at 22.)
The Duty of Plaintiff to Restore upon Rescission
“At common law and equity, rescission entails the undoing of the original transaction and restitution involves the restoration of each party to his precontract position.” (Randall v Loftsgaarden, 478 US 647, 671 [1986, Brennan, J., dissenting].)
“In practice, where the defendant has sold something to the plaintiff for money, the steps leading to return to the status quo are streamlined: generally the plaintiff must tender the subject of the sale to the defendant and the defendant must tender to the plaintiff the sale price plus interest, minus whatever direct value the plaintiff has received from the transaction.” (Id. at 671-672; see E. T. C. Corp. v Title Guar. & Trust Co., 271 NY 124, 127-128 [1936] [“ ‘plain distinction between the equitable remedy of rescission or cancellation (where, as in all equity decrees, complete relief is awarded to the defendant as well as to the plaintiff), and the legal remedies’ ”], quoting 5 Pomeroy, Equity Jurisprudence, at 4765; Vitale, 66 AD2d at 564 [same]; 5A Corbin, Contracts § 1114 [rev ed]; Restatement [Second] of Contracts § 376 [1981] [restitution to party avoiding contract]; id. § 384 [restoration to culpable party by party avoiding contract].)
“He who seeks equity must do equity” (Holdeen v Rinaldo, 28 AD2d 947, 949 [3d Dept 1967]). Accordingly, the one-sidedness of the remedy proposed by plaintiffs, whether or not appropriate in a rescission at law case (Sim v Edenborn, 242 US 131, 135 [1916]; Neblett v Macfarland, 92 US 101, 103-105 [1875]; *921 cf., Heckscher v Edenborn, 203 NY 210 [1911]), cannot form the basis of an equitable decree of rescission.[4]
Adjustment by Reason of Depreciated or Appreciated Shares
Taking defendant’s claim that the shares have depreciated first, plaintiffs rely on the above-cited Spyder Enters, case as authority for the proposition that defendant, as the wrongdoer, must absorb the loss occasioned by the asserted decrease in value of the shares since 2001. This rule, however, is confined to the situation in which the wrongdoer was in control of the enterprise before rescission was ordered, and because of his own conduct could not be put into the position he was in before the contract was entered into. In such cases, it is said, “[i]f the wrong-doer has, by his own act, complicated the case, so that full restoration cannot be made, he has but himself to blame.” (Hammond v Pennock, 61 NY 145, 152 [1874]; see Butler v Prentiss, 158 NY 49, 63-64 [1899]; Masson v Bovet, 1 Denio 69 [1845].)
But in this case, the plaintiffs were in control of the enterprise, the money having been paid to the defendant, who retained no interest in the corporation, and the allegation is that Newhouse so mismanaged the business that, in fairness, defendant should not have to, even as the culpable party, bear the entire loss by mere restitution to him of the depreciated shares without adjustment. As defendant contends, the depreciation in Spyder Enters. was occasioned wholly by market conditions, not the party in possession of the vehicle. In this case, defense counsel conceded at oral argument that any loss caused by mere market conditions or economic decline quite out of plaintiffs’ control was his client’s to bear. In a case of a plaintiff seeking rescission who is without fault or blame with respect to the value of property in her possession which must be restored to the party against whom rescission is sought, this concession is in accord with applicable law. (Butler v Prentiss, 158 NY at 64 [requirement of restoration to “the one guilty of the fraud” is not, in cases where the party defrauded is “without fault” in the management of the property to be restored, “strictly applied, because it would become a loophole for the escape of fraud”]; Sokolow, Dunaud, Mercadier & Carreras v Lacher, 299 AD2d 64, 72 [1st Dept 2002] [“rule that rescission is unavailable where a party cannot be returned to the status quo ante will not be strictly enforced where the party against whom rescission is sought is a *922 wrongdoer who is exploiting its change of position to shield its wrongdoing”]; see also, Snow v Alley, 144 Mass 546, 551, 11 NE 764, 773 [1887] [“If that which he returns is diminished in value by natural causes, or in the ordinary and proper use of it, he may still return it, as in such case, the contract being rescinded, such diminution is the loss of the original owner”]; Restatement of Restitution § 66, Comment b [1937] [“The fact that the subject matter suffered a severe depreciation in market value does not prevent restitution upon its retransfer in specie, provided the other party to the transaction was at fault”]; Restatement [Second] of Contracts § 384, Comment a [1981] [“Mere depreciation in market value, however, is not such a change as will preclude restitution”]; 27 Lord, Williston on Contracts § 69:51, at 127-129 [4th ed 2003] [rescission not precluded by “diminution in value of the consideration by lapse of time, or by reasonable use before the discovery of the fraud”].)
Defendant maintains, however, that he has sufficiently established, albeit by hearsay affidavit, that discovery will lead to admissible evidence of Newhouse’s very real mismanagement of the company. The court agrees that defendant’s proffer in this regard should not be rejected as conclusory or speculative, and that (for the reasons stated below) a defendant such as Raub properly restored to his 50% share of the corporation upon even a conditional rescission will have rights to explore the issue through discovery in a statutory action under the Business Corporation Law.[5]
An Interlocutory or Conditional Decree is Appropriate
Defendant contends that Newhouse should account for the depreciation of the corporate stock due to her mismanagement since the stock redemption in 2001. This contention is only partially correct. The timing of plaintiffs’ discovery of the defendant’s breach of fiduciary duty was not considered important enough for defendant to plead loches in defense of plaintiffs’ prior motion for partial summary judgment. That timing, however, is critical to the particulars of the equitable rescission decree to be issued by the court, because the cases hold that plaintiff need only account for depreciation of the stock due to mismanagement that has occurred since her discovery of *923 defendant’s breach of fiduciary duty. (Sipola v Winship, 74 NH 240, 66 A 962 [1907]; see Gannett Co., Inc. v Register Publ. Co., 428 F Supp 818, 831-832 n 32 [D Conn 1977, Newman, J.] [“Neblett rule makes sense only where the decline took place before knowledge of the fraud or after notification to the opposing party”].) The Sipola case is often cited for the proposition that rescission is unavailable and should be denied when “the property received by the plaintiff as a result of fraud becomes less valuable because of the plaintiff’s own fault or mismanagement.” (2 Dobbs, Remedies § 9.3 [3], at 588 [2d ed 1993] [“In such cases restitution should be denied”]; see also, 1 George Palmer, Restitution § 3.12, at 308 [1978] [“restitution was denied”]; Dobbs, Pressing Problems for the Plaintiff’s Lawyer in Rescission: Election of Remedies and Restoration of Consideration, 26 Ark L Rev 322, 351 [1972] [“he can’t get rescission”].) But that is not what the court held in Sipola. Rather, the court acknowledged the force of cases decreeing restitution notwithstanding that the property in specie was depreciated or damaged, because “in such cases it was practicable to shape the decree so as to do equity between the parties.” (Sipola v Win-ship, 74 NH at 243, 66 A at 964.) The court’s holding was, however, that in the particular case before it, “shap[ing] the decree so as to do equity between the parties” was impossible, because it was “inequitable to require the defendant to take the farm back, greatly deteriorated in value, even in connection with the payment of a sum of money to compensate him for the deterioration, or to take it back after so long a delay.” (Id. [emphasis supplied].) Thus, if it is possible to shape an equitable decree, restitution may be appropriate notwithstanding damage or depreciation at plaintiffs hands while she was in possession and after her discovery of the fraud. In this aspect, Sipola is consonant with New York law: “The terms upon which rescission may be granted where complete restoration of the parties to their former position is impossible rests in the sound discretion of the courts.” (Buffalo Bldrs. Supply Co. v Reeb, 247 NY 170, 176 [1928].)
The case of Duggan v Platz (263 NY 505 [1934]) points the way. In that case, plaintiff sued to rescind a corporate stock sale on the ground of fraud, and for an accounting. The referee found for the plaintiff and “directed a judgment not only rescinding the transfer of stock but unqualifiedly ordering its retransfer to the plaintiff.” (Id. at 508.) The referee deferred the accounting to a “future determination,” ostensibly on the theory that “the *924 accounting was to be the means by which the equities, if any, were to be determined and the terms of the retransfer fixed.” (Id.) A final judgment was entered directing an “unqualified re-transfer of the stock . . . ‘without prejudice, however, to any rights which appellants may have to an accounting from defendant company.’ ” (Id., quoting Duggan v Platz, 238 App Div 197, 202 [3d Dept 1933].)
On appeal, the Court of Appeals modified the judgment on the ground that the defendants, having been found “trustees, ex maleficio, . . . are hardly in a position to bring an action for an accounting.” (Id. at 509.) Accordingly, the Court of Appeals made the judgment “interlocutory in form; by striking the provisions directing an unqualified retransfer of the stock . . . ; by directing an accounting to be had between the parties; and by providing for a delivery of the stock in question upon such terms as may be fixed by the final judgment.” (Id.)
Duggan had some important differences with this case, but it provides valuable guidance here. First, in Duggan it was the plaintiff who sold the stock and would be having it returned to her whereas in this case the plaintiff purchased the stock and will be returning it to the defendant. Second, in Duggan the plaintiff, upon return of the stock, became “owner of the entire capital stock outstanding [and therefore] [u]nder [the] circumstances, the corporation may be disregarded.” (Id. at 508.) Here, on the other hand, upon restoration of the stock to defendants, the parties will each be 50% stockholders, and therefore observance of the corporate form will be required. Two choices present themselves. The court could, prior to restoration of the shares to defendant, direct an accounting and thereafter provide for delivery of the stock upon such terms as may be just. Or the court could direct an exchange in specie, each to be held in escrow pending a dissolution action under the Business Corporation Law in which defendant’s, claims of adjustment by reason of mismanagement may be adjudicated. Plaintiff announced at oral argument her intention to dissolve the corporation upon any retransfer, and the statute also gives defendant, as holder of stock in escrow, rights to litigate the mismanagement issue. (Business Corporation Law § 1104-a.) A final judgment of rescission may then be decreed in this action. As Duggan emphasized, “plaintiff was equitably bound to do equity as a condition precedent to obtaining equitable relief” and “the court has power and it is its duty to protect the equities of all parties.” (263 NY at 507 [adding that “defendants, *925 even though guilty of the fraud charged, were not outlaws”], nearly quoting Stoffela v Nugent, 217 US 499, 501 [1910, Holmes, J.].)[6]
Plaintiff is Entitled to Rescission of the Releases
On the prior motion, defendant maintained that plaintiffs’ action was barred by the releases executed by plaintiffs in favor of defendant on July 20, 2001, in connection with the stock redemption agreement. The releases covered any claims arising out of a dispute between the parties concerning the payment by Ajettix of some $87,000 to Microsoft to obtain upgradable Microsoft licenses ultimately for the benefit of PAETEC, defendant’s current employer. Defendant contends that, because plaintiffs “knew of the underlying events regarding the Microsoft licenses when they were discovered in 1999,” the releases are not subject to rescission by reason of defendant’s breach of fiduciary duty not then known to plaintiff.
This argument misses the mark. Before the releases were signed, plaintiffs maintain that they had a cause of action against defendant in connection with the acquisition by his current employer of upgradeable licenses virtually free of charge. Whether or not such a cause of action existed and whatever its merits, plaintiffs released any such claim as part of the consideration for the stock redemption. This court held in the prior decision granting plaintiffs summary judgment that they were entitled to rescission of the stock redemption transaction by reason of defendant’s breach of fiduciary duty that the release did not bar plaintiffs’ rescission claim. Now the court holds that if the stock redemption is to be rescinded, as defendant now concedes for purposes of this motion it may be (upon whatever adjustment is deemed equitable), the releases must be rescinded also. As in Sher v Sandler (325 Mass 348, 90 NE2d 536 [1950]), a case on its facts similar to this one, the “release [wa]s obtained without a full disclosure of the relevant facts by one who is under a duty to reveal them.” (325 Mass at 354, 90 NE2d at 540.) It was held that,
“the release . . . was inextricably linked to the sale[;] [fit would be strange indeed if we should hold that the plaintiff was entitled to rescind the sale of stock because of the defendant’s nondisclosure but *926 that the release which was given in conjunction with such sale was immune from attack and. extinguished the right to rescind,” (Id.; see also, Pacelli Bros. Transp., Inc. v Pacelli, 189 Conn 401, 409, 456 A2d 325, 329 [1983].)
The fact that plaintiffs knew of the particulars concerning the upgradeable license acquisition by PAETEC is not important except insofar as their knowledge gave them reason to believe that they had a viable claim against defendant worthy of being covered by the releases they executed. One can validly release collateral claims as part of an overall transaction settling the dispute between the parties. It was probably the case, from all the papers on these two motions reveal, that Newhouse believed when she executed the releases that she (or more properly the corporation) had a right to recover from defendant for the manner in which PAETEC acquired the Microsoft licenses that Ajettix paid for. Whatever the merits of her belief, she released defendant in connection with that transaction when she agreed to pay defendant to redeem his stock in Ajettix. Having recovered his share of the corporation in exchange inter alla for relinquishing her legal claims, her rescission of the transaction puts her back to the status quo ante, in which she will have her perceived legal claims against defendant for the PAETEC license acquisition paid for by Ajettix, but no part of defendant’s 50% share of the stock she received in the redemption agreement. At the same time, defendant will not have the money paid for his interest in the corporation, but he will have his stock “but no release.” (Fleming v United States Postal Serv. AMF O’Hare, 27 F3d 259, 262 [7th Cir 1994, Posner, J.].) Defendant cannot “take the position” that he is entitled to the stock and to have the releases also, “for the surrender of her claim [against defendant in connection with the PAETEC acquisition] was part of the consideration for [defendant’s offer to relinquish his stake in the company].” (Id. [on quite different facts using the quoted formulation].) Therefore, plaintiff is entitled to a conditional judgment rescinding the releases also, albeit with the adjustments to be computed after this interlocutory judgment is entered pursuant to Duggan v Platz (supra).

. Defendant has indicated that he did not become aware of John Smith’s affiliation with Croop until John Smith’s EBT (defendant’s affidavit If 26 [Dec. 21, 2004]).

. Apparently after talking to Madison.

. The court does not consider that plaintiffs’ motion for summary judgment concerns the third cause of action, which is separately denominated “rescission.” Nor does the court consider that plaintiffs’ motion concerns the fourth or fifth cause of action.

. Even in actions at law, the plaintiff must “mak[e] allowance for benefits received.” (Schank v Schuchman, 212 NY 352, 359-360 [1914].)

. By the same token, contrary to plaintiffs’ position, if the corporation has appreciated, plaintiff “may be ordered to account for any profits which [s]he may have received up to this date.” (Thomas v Beals, 154 Mass at 54, 27 NE at 1005.)

. In so holding, the Court of Appeals specifically rejected the notion that an inability to restore defendants to their original position requires no adjustment because “[t]he law cares very little what a fraudulent party’s loss may be, and expects nothing for his sake.” (238 App Div at 201.)