Gloria Yuan San Shih, Plaintiff,

against
Ji Yong Kim AND SHIH & KIM CORP. D/B/A APOLLO ART & MUSIC INSTITUTE, Defendants.


2928/14

For Plaintiff
Stephen B. Irwin, Esq.
Flushing, NY 11355
For Defendant
Joseph D. Nohavicka, Esq. Astoria, NY 11106


Timothy J. Dufficy, J.

DECISION AFTER TRIAL
A trial was held before this Court, on October 12 and 14, 2016, December 2 and 7, 2016, and January 4 and 5, 2017. Since this was a bench trial, the Court was both the finder of facts and the determiner of questions of law. The Court considered the testimony of the witnesses, gave weight to that testimony, and generally determined the reliability of the witnesses' testimony (See Horsford v Bacott, 32 AD3d 310, 312 [1st Dept. 2006]). The Court also considered the interest or lack of interest in the case and the bias or prejudice of the witnesses (See People v Ferguson, 178 AD2d 149 [1st Dept. 991). Having reviewed the parties' submissions and having reflected upon the evidence submitted at trial, the Court renders the following Findings of Fact and Conclusions of Law. 
FINDINGS OF FACT
The plaintiff and individual defendant met at the Brooklyn Music Conservatory, as piano teacher (plaintiff) and student (defendant Kim). After a few months, the plaintiff and defendant began a romantic relationship. After several months more, the defendant gave the plaintiff a ring, which the plaintiff accepted as an engagement ring. The parties are in dispute as to whether it was an engagement ring, or just a birthday gift. The defendant insists that it was just a gift, and seeks its return. However the evidence at trial establishes that the ring was purchased and given to the plaintiff, in January, 2009. The plaintiff's birthday is May 13. Thus, the facts do not support the defendant's contention. While the parties were dating, they also discussed starting a music school together. The defendant, being a graduate of Bernard Baruch College and a finance major, as well as a [*2]graduate finance student at Columbia University, agreed that he would deal with the management and finances of the school, acting as its Chief Financial Officer. The plaintiff, an accomplished pianist, would be a part-time piano teacher, silent partner and owner. The plaintiff testified that she would not have invested in the corporation if the parties were not going to be married. The defendant also admitted that he did not think the plaintiff would have contributed to the school if they were not going to be married.
The defendant corporation was registered by the New York State Department of State, on September 30, 2008.[FN1] It did business under the trade name "Apollo Music And Art Institute". The corporation did not file any additional corporate documents other than the initial registration forms. The Court finds that there were no bylaws or corporate meetings. When asked how often the annual meetings were held, defendant Kim stated that they were informally held every six (6) months, and no minutes were ever kept. The plaintiff claims that the parties orally agreed to the following terms: they would be equal partners in the school, each owning 50% of the corporate stock; they would each make equal capital contributions to the corporation; the defendant, due to his business degree and experience, would handle the day to day finances and administration of the school as its Chief Financial Officer; the plaintiff, an accomplished pianist, would be a part-time piano teacher for the school and silent partner in the corporation; neither the plaintiff nor the defendant would draw any salary for the services they performed for the school. In addition, the parties, as equal shareholders, orally agreed to contribute capital equally to the new corporation. However, the documentary evidence at trial established that the defendant only contributed approximately $8,000, while the plaintiff contributed $46,000 of her own money to the music school. 
Defendant Kim found a location, on Northern Boulevard in Bayside, New York. The parties signed a five-year lease commencing in August 2008. The interior of the school was completely empty when the lease was signed, and the defendant spent considerable time coordinating the interior construction. However, the testimony demonstrated that defendant Kim hired "street" laborers to perform the construction, paid them cash without any receipts, and then paid a licensed contractor to sign-off on the work. The school was fully-operational in September, 2009. Defendant Kim handled the day-to-day operations of the school. He and the plaintiff hired the music teachers. Defendant Kim maintained control over the school's finances, while the plaintiff taught piano classes at the school on a part-time basis.
The plaintiff claims that she relied upon defendant Kim to operate the business completely because she thought they would soon be married. The Court credits her testimony in this regard. At the beginning of 2012, the parties ended their personal relationship, but maintained their business relationship at the school. 
The testimony of the defendant Kim indicates that he failed to keep records of [*3]income and expenses. Plaintiff's audit of the corporate bank account shortly before trial revealed that funds were transferred to an account which was defendant Kim's personal account. The testimony of the defendant Kim indicates that he failed to keep records of income and expenses. Corporate bank statements revealed that the defendant systematically transferred funds totaling $101,978, between November 2008 and December 2013, to this account without the plaintiff's knowledge or consent. For example, he transferred $53,930 out of the corporate account into a joint account that defendant Kim owned with his mother. He made ATM withdrawals of $14,445, paid $5,931.53 to a company called Nasco, which collects tax liens. Defendant Kim's private account showed that he paid a total of $35,000 to a company called T3 Trading. This was a proprietary day-trading company. Plaintiff claims that in the middle of 2011, without her knowledge or consent, defendant Kim had his sister and mother operate the school in his absence. Plaintiff suspected that the defendant relinquished management of the music school to his mother and sister in order to become a day trader. The grand total of all withdrawals was $115,843.94.
Defendant claimed that the amounts transferred from the corporate account were used for construction and teacher salaries, and rent. He claimed that he recorded the construction costs he paid in an Excel file or kept the receipts. However, he was unable to produce the file, or the receipts. He then claimed that he hired "street laborers" to do the construction, paid them cash, and did not receive any receipts. He testified that he paid a contractor to sign-off on the required license. If his testimony is to believed, this is an illegal practice. By contrast, the plaintiff demonstrated that most of the construction costs were paid through the corporate account. The substantiated construction receipts paid through Mr. Kim's private account totaled only $15,387.
The plaintiff testified that the teachers were complaining that they had not been paid, and the landlord contended that the rent was not paid. Eventually, the landlord actually evicted the school, not once, but twice. This effectively negated defendant Kim's testimony that he used corporate funds to pay rent. The plaintiff contends that the audit of Mr. Kim's personal bank account indicates numerous charges for restaurants, amusement parks, and entertainment using corporate funds. When defendant Kim was asked why he did not keep receipts as financial officer of the corporation, he claimed that "it's very messy" (Tr. P. 201, line 12). The Court finds the defendant Kim's explanations in this regard to be totally without credibility, and riddled with dishonesty.
As to taxes, defendant Kim testified that he had the accountant file quarterly returns for income tax, but he did not pay the taxes. Eventually, the music school became delinquent and subject to a tax lien. Defendant Kim was unsure whether this was a state or federal tax lien, but monies were deducted from the corporate bank account in payment of this lien. As Chief Financial Officer, the Court would expect defendant Kim to have performed better.
The defendant testified that the music school was not making a profit. In 2010, the [*4]defendant and the company's accountant prepared a 2009 W-2 form for the plaintiff, despite the fact that she was not paid anything by the music school that year. Defendant Kim testified that he made payments of $5,931.53 from the corporation's account in payment of tax liens that were owed to the New York State Department of Taxation and Finance for failure to pay New York State and New York City income taxes. However, this amount was actually garnished from the company account, as previously stated.
The school did not maintain any accounting records other than a "cash book" of student tuition deposits. This consisted of a student's English composition book containing students names, dates, the amount of tuition paid, and whether it was cash or credit card. Defendant Kim usually made bank deposits of students' tuition several times per week. On October 14, 2016, the Court directed defendant Kim to provide the cash book which recorded student tuition fees to the plaintiff on the next court date. On the next court date, December 2, 2016, the defendant advised the Court that the cash book could not be found. The book was in defendant Kim's possession. The Court finds that his loss of the book was either negligent or intentional, but either way, because this book is material evidence in connection with the defendant's claim that the music school was not profitable, and defendant Kim knew or should have known that it would be necessary in connection with the plaintiff's 2012 lawsuit, it ought to have been retained.
The defendant testified that he was looking to dissolve the business in August, 2013, but he never made his feelings known to the plaintiff. His disloyalty to the existing venture is exemplified by the fact that he formed a new corporation for the music school on September 3, 2013, while the old corporation was still in existence. The new corporation was owned by defendant Kim and his sister. The plaintiff discovered that the defendant was still operating the school in September, 2013, with his sister. The Court credits the plaintiff's testimony that defendant Kim told the plaintiff that he would pay her back her investment, but never did so. For a three month period, between September, 2013 and December, 2013, numerous cash receipts and checks were not deposited into the corporate account. In November, 2013, the City Marshall who had evicted the defendants earlier changed the locks on the school's door, which effectively evicted the defendants from the premises. Defendant Kim contends that he made payments for rent arrears from his private bank account, between September and December, 2013, to the original landlord to try to regain entry and get a lease extension. However, defendant Kim had started the new corporation run by him and his sister at that point. Defendant Kim claims that the school actually went out of business, on December 11, 2013, when it's corporate bank account was closed. However, the corporate entity was not dissolved. Defendant Kim allegedly knew that the corporation's lease would expire on December 31, 2013. The original landlord went into bankruptcy, and defendant Kim was able to secure a new lease with the new landlord for his new music school which was called Apollo Arts Group, Inc.
Defendant Kim and his sister are 50% owners of the Apollo Arts Group, Inc., [*5]which took over for Apollo Music and Arts Institute. The new corporation was registered with the New York State Department of State, on September 3, 2013. It occupies the same space as the former music school defendant operated with the plaintiff. The Court notes that defendant Kim chose a name for the new school that is very similar to the school that he had with the plaintiff.
Defendant's counsel claims that the business owned by the parties was not continued by defendant Kim and his sister; but rather, it was a new business model and corporation under the name Rhythm NY. This was not part of the testimony at trial, and will be given no weight. However, since it was gratuitously included by counsel, the Court points out for the record that the prior entity, established by defendant Kim and his sister, on September 3, 2013, "Apollo Arts Group Corporation", is still listed as an active corporation in the records of the New York State Department of State Division of Corporations. There is no corporate entity known as "Rhythm NY" listed. Moreover, the domain name of RhythmNY.com was not registered until April 2, 2014.
CONCLUSIONS OF LAW
Civil Rights Law §80-b
§ 80-b [Recovery of property transferred in contemplation of marriage]Nothing in this article contained shall be construed to bar a right of action for the recovery of a chattel, the return of money or securities, or the value thereof at the time of such transfer, or the rescission of a deed to real property when the sole consideration for the transfer of the chattel, money or securities or real property was a contemplated marriage which has not occurred, and the court may, if in its discretion justice so requires, (1) award the defendant a lien upon the chattel, securities or real property for monies expended in connection therewith or improvements made thereto, (2) deny judgment for the recovery of the chattel or securities or for rescission of the deed and award money damages in lieu thereof.
This Court properly dismissed the cause of action alleging a violation of Civil Rights Law §80-b. First, the plaintiff failed to demonstrate that the sole consideration for her investment in the music school was a contemplated marriage. Second, the plaintiff has not demonstrated that the statute intended to cover investments in business ventures, such as that at bar, and has submitted no case authority for that proposition. The case cited by plaintiff's counsel, Gaden v Gaden, 29 NY2d 80 [1971] involved the return of real property, which is specifically encompassed by the above statute. 
Breach of Fiduciary Duty
To plead a breach of fiduciary duty, a plaintiff must allege: 1) defendant owed a fiduciary duty; 2) the defendant committed misconduct; and 3) the plaintiff suffered damages caused by that misconduct (Burry, et al. v Madison Park Owner LLC, 84 AD3d 699, 699-700 [1st Dept. 2011]); Moffatt v JP Morgan Chase Bank, 2012 NY Misc. LEXIS 6240, *19-20, 2012 NY Slip Op 33274(U), 17 [Sup Ct. NY Co. 2012] affirmed 110 AD3d 431 [1st Dept. 2013]). "A fiduciary relationship arises between two persons [*6]when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." ( Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 561 [2009] quoting EBC I v Goldman Sachs & Co., 5 NY3d 11, 19 [2005]). This relationship is grounded on a "higher trust" than normally present in the marketplace between those involved in arm's length business transactions (see HF Mgmt. Servs., LLC v Pistone, 34 AD3d 82, 85 [1st Dept. 2006]). 
The "relationship between shareholders in a close corporation, vis-a-vis each other, is akin to that between partners and imposes a high degree of fidelity and good faith" (Brunetti v Musallam, 11 AD3d 280, 281[1st Dept. 2004] quoting Fender v Prescott, 101 AD2d 418 [1st Dept. 1984] affirmed 64 NY2d 1077, 1079 [1985]). This "strict standard of good faith imposed upon a fiduciary may not be so easily circumvented" (id. at 423).  This is especially the case where, as here, the parties have an expectation of marriage, and a bond of mutual trust and reliance.
Here, defendant Kim knew or should have known that the plaintiff relied upon his expertise in finance to manage the business. Notwithstanding his stellar academic credentials, he displayed a surprising lack of discipline and order at record-keeping, segregation of corporate funds from those in his personal account, debt management, and income-tax compliance. He literally abandoned his obligations with regard to the parties' venture when, unbeknownst to the plaintiff, he accepted a full-time position at a proprietary trading company,[FN2] effectively abandoning his duties at the music school, dooming it to failure. Defendant Kim owed a duty of undivided and unqualified loyalty to the corporation, so as to prevent actions which crippled or injured it (see e.g. Howard v Carr, 222 AD2d 843, 845[ 3rd Dept. 1995]). Instead, he misappropriated funds belonging to the corporation, he failed to keep any records to account for his expenditures, he failed to conduct corporate activities in conformity with corporate strictures, he used corporate funds for personal purposes, including day-trading, he failed to record corporate revenues using a failsafe system which was backed up, he failed to pay rents, thereby causing the corporation to be evicted, he failed to pay taxes, thereby causing a lien and garnishment of the corporation's back account. In short, his actions as Chief Financial Officer of this company are inconsistent with his background with a degree in finance and his current status as a graduate student in finance at Columbia University.
The Business Judgment Rule
Absent claims of fraud, self-dealing, unconscionability or other misconduct, the business judgment rule limits judicial inquiry into the actions of corporate managers to [*7]whether the action was authorized and whether it was taken in good faith and in furtherance of the legitimate interests of the corporation (see Shapiro v Rockville Country Club, Inc., 22 AD3d 657 [2d Dept. 2005]; Gillman v Pebble Cove Home Owners Assn., 154 AD2d 508 [2d Dept. 1989]). In the case at bar, the defendant Kim did not act in good faith when he co-mingled corporate monies with his own, and then left the business to take another full-time position. His actions smack of misconduct, and were not reasonably calculated to advance the legitamate interests of the corporation (see Beznicki v Fetaya, 11 Misc 3d 1087(A), 819 NYS.2d 846, 846, 2006 NY Misc. LEXIS 979, *10-11, 2006 NY Slip Op 50755(U), 4 [Sup Ct. NY Co. 2006]). Accordingly, the business judgment rule cannot be raised as a shield under these circumstances.
The Court finds that, based upon the foregoing, the plaintiff has proven that the defendant breached his fiduciary duty to the plaintiff when he misappropriated funds belonging to the corporation, he failed to keep any records to account for his expenditures, he failed to conduct corporate activities in conformity with corporate strictures, he used corporate funds for personal purposes, including day-trading, he failed to record corporate revenues using a failsafe system which was backed up, he failed to pay rents, thereby causing the corporation to be evicted, he failed to pay taxes, thereby causing a lien and garnishment of the corporation's back account. In response, the defendant did not deny that he took a full time position elsewhere, that he could not produce the cash book or other records documenting or justifying his expenditures or purchases. The Court rejects his efforts to mitigate the effect of his actions by claiming that the plaintiff was somehow able to run the business by herself. Moreover, his explanations for the use of corporate funds was not credible. Nor was it supported by documentary evidence that was conveniently missing during the disclosure process and at trial. Accordingly, the plaintiff is entitled to recover for breach of fiduciary duty.
Piercing the Corporate Veil
Veil-piercing is a narrowly construed doctrine limiting "the accepted principles that a corporation exists independently of its owners . . . and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners" (Matter of Morris v New York State Dept. of Taxation & Fin.,  supra at 140; see Vivir of L I, Inc. v Ehrenkranz, 145 AD3d 834 [2d Dept. 2016]). The party seeking to pierce the corporate veil bears the heavy burden of "showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (id. at 141; Sheridan Broadcasting Corp. v Small, 19 AD3d 331, 332 [1st Dept 2005]). Piercing the corporate veil is an equitable concept that allows a claimant or creditor to disregard a corporation and to hold its controlling shareholders personally liable for corporate debts or other liabilities. "Additionally, the corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it [*8]primarily transacts the dominator's business instead of its own and can be called the other's alter ego" (Williams v Lovell Safety Mgt. Co., LLC, 71 AD3d 671, 672 [2d Dept. 2010][internal quotation marks omitted]; see DeMartino v 3858, Inc., 114 AD3d 634, 636, 979 NYS2d 648; Campone v Pisciotta Servs., Inc., 87 AD3d 1104, 1105 [2d Dept. 2011]).
The concept of piercing the corporate veil is an exception to the general rule that a corporation exists independently of its owners who are not personally liable for its obligations, and that individuals may incorporate for the express purpose of limiting their liability (see generally Bartle v Home Owners Coop., 309 NY 103, 106 [1955]). Where successful invocation of the doctrine of piercing the corporate veil permits, in certain circumstances, the imposition of personal liability on owners for the obligations of their corporation (see Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 140-141 [1993]).
A plaintiff seeking to pierce the corporate veil must demonstrate that a court should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue. Indicia of a situation warranting veil-piercing include: " '(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated  corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own' ". (Peery v United Capital Corp., 84 AD3d 1201, [2d Dept. 2011] quoting Gateway I Group, Inc. v Park Ave. Physicians, P.C., 62 AD3d at 146 [2d Dept. 2009] quoting Shisgal v Brown, 21 AD3d 845, 848-849 [2d Dept. 2005]).
In Matter of Agai v Diontech Consulting, Inc., (138 AD3d 736  [2d Dept. 2016]), the Second Department held that:
Here, the petitioners demonstrated their prima facie entitlement to judgment as a matter of law on so much of the petition as sought to pierce Diontech's corporate veil by submitting evidence showing, inter alia, that the appellants dominated Diontech, that Diontech did not adhere to any corporate formalities such as holding regular meetings and maintaining corporate records and minutes, that the appellants used corporate funds for personal purposes, and that the appellants stripped Diontech of assets as they wound down the business, leaving it without sufficient funds to pay its creditors, including the petitioners (see Ventresca Realty [*9]Corp. v Houlihan, 41 AD3d 707, 838 N.Y.S.2d 609; Godwin Realty Assocs. v CATV Enters., 275 AD2d 269, 270, 712 N.Y.S.2d 39; Austin Powder Co. v McCullough, 216 AD2d 825, 827-828, 628 N.Y.S.2d 855). In opposition, the appellants failed to raise a triable issue of fact. The appellants' self-serving affidavits, which contradicted their prior deposition testimony, were insufficient to defeat summary judgment (see Perez v Bronx Park S. Assocs., 285 AD2d 402, 404, 728 N.Y.S.2d 33; Phillips v Bronx Lebanon Hosp., 268 AD2d 318, 701 N.Y.S.2d 403).
The Second Department had previously held, in Pae v Chul Yoon, 41 AD3d 681, 682 [2d Dept. 2007]) that:
Testimony at trial established that the plaintiff and the appellant's corporation entered into a valid agreement for the sale and purchase of goods, and that the appellant, the sole owner of the corporation, dominated the corporation and was solely responsible for the wrongful failure of the corporation to pay the plaintiff. The evidence also revealed the absence of corporate formalities, such as the lack of a distinction between corporate funds and the defendant's personal funds. Therefore, the JHO properly concluded that the appellant was personally liable under the agreement [citations omitted].
Likewise, in the case at bar, there was no evidence of adherence to corporate formalities, such as the maintenance of records documenting the purpose for the cash expenditures that appeared targeted for the personal use and benefit of the individual defendant. There were no minutes of annual shareholders meetings, which the defendant testified occurred "every six months." There were no records of receivables, other than a cash book that was conveniently "lost" sometime prior to trial. The evidence was overwhelming that defendant Kim used corporate funds for personal purposes, including day-trading, that he co-mingled corporate monies with his own, and that he essentially performed his duties as Chief Financial Officer in a manner that was calculated to, and actually did, impede the rights of the plaintiff as a shareholder, and doomed the corporation to failure. The Court concludes that he misappropriated funds belonging to the corporation, he failed to keep any records to account for his expenditures, he failed to conduct corporate activities in conformity with corporate strictures, he used corporate funds for personal purposes, including day-trading, he failed to record corporate revenues using a failsafe system which was backed up, he failed to pay rents, thereby causing the corporation to be evicted, he failed to pay taxes, thereby causing a lien and garnishment of the corporation's back account.

In Azte Inc. v Auto Collection, Inc., 36 Misc 3d 1238(A), 961 NYS2d 356, 2012 NY Slip Op 51731(U), 12 [Sup Ct. Kings Co. 2012; Demarest, J.] ), Justice Demarest, after trial, pierced the corporate veil as to one of the individual defendants, finding that:
Based upon the testimony and exhibits introduced at trial, it is clear that Steven [*10]exercised complete domination and control of the Auto Collection, including the transactions at issue in this action, commingled the Auto Collection's funds with his personal funds and that of another unrelated corporation, Platinum Volkswagen, owned by Steven, and that Steven's domination resulted in significant damages to the plaintiffs in that insufficient funds remain in the Auto Collection to satisfy plaintiffs' judgments...Steven commingled the Auto Collection's funds with his personal funds and used corporate assets for his personal benefit. Plaintiffs introduced substantial evidence that Steven wrote checks from the Auto Collection to himself, on multiple occasions, totaling $340,000. Although Steven described these payments as either a repayment of a loan, or used to pay the Auto Collection's expenses, the evidence established that substantial portions of these funds were actually used to pay for Steven's new business entity, Platinum Volkswagen, or for other personal purposes.
Accordingly, defendant Kim "abused the privilege of doing business in the corporate form to perpetrate a wrong" and thus it is appropriate for this court to intervene in equity and pierce the corporate veil (Morris v State Dep't of Taxation & Fin., 82 NY2d 135 [1993]). The corporate veil is pierced, as to defendant Kim, and he is jointly and severally liable for any judgment in this matter entered by this Court.
Corporate Waste and Mismanagement
It is well settled law that a shareholder claiming corporate waste or mismanagement of assets may sue derivatively (see Abrams v Donati, 66 NY2d 951, 953 [1985]). The Court of Appeals has held that, "[f]or a wrong against a corporation a shareholder has no individual  cause of action, though he losses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation" (Moffatt v JP Morgan Chase Bank, supra, quoting Abrams v Donati, supra.) Thus, "allegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more" reflect a wrong to the corporation and not to the shareholder  individually (Id.) Further, in a similar case involving a closely held corporation with two shareholders each owning 50% of the corporation, the Court of Appeals held that "the fruits of a diverted corporate opportunity are properly a corporate asset." (Glenn, et al. v Hoteltron Systems, Inc., et al., 74 NY2d 386 [1989]).
Here, the plaintiff has sued in her own name, and has not properly plead this cause of action. Accordingly, it must be dismissed on that basis (see Quatrochi, et al. v Citibank, N.A., et al., 210 AD2d 53 [1st Dept. 1994] [dismissing complaint pursuant to CPLR 3211 (a)(7) based on corporate shareholder's lack of standing to sue in his own name for injuries to the corporation] ). In addition, pursuant to Business Corporation Law § 720 (a)(1)(B), an "action may be brought against one or more directors or officers of a corporation" with respect to "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties." "It is and has always been general law that a director may be held accountable [*11]for the waste of corporate assets whether intentional or negligent without limitation to transactions from which he benefits" (Rapoport v Schneider, 29 NY2d 396, 403 [1972]). The determination of whether or not there is a waste of corporate assets is largely a question of fact (see Shapiro v Rockville Country Club, Inc., 22 AD3d 657, 658 [2d Dept 2005], leave denied 6 NY3d 705 [2006]). However, it is clear from the statutory language that waste is merely one potential component of a breach of fiduciary duty. This cause of action is therefore duplicative of the cause of action for breach of fiduciary duty and is dismissed (see770 Owners Corp. v Spitzer, 25 Misc 3d 1204(A), 1204A, 901 NYS2d 902, 902, 2009 NY Misc. LEXIS 2474, *14-15, 2009 NY Slip Op 51968(U), 6-7 [Sup Ct. NY Co. 2009]).
Derivative Action
A shareholder, even in a closely-held corporation, may not recover in his or her individual capacity for wrongs against the corporation (see Abrams v Donati, 66 NY2d 951[1985]; Rodolico v Rubin & Licatesi, P.C., 112 AD3d 608, 609-610 [2nd Dept. 2013]; Brancaleone v Mesagna, 290 AD2d 467, 468 [2d Dept. 2002). Under New York law, "an individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a deprecation or destruction of the value of his corporate stock" (Fifty States Mgmt. Corp. v Niagara Permanent Sav. & Loan Assn., 58 AD2d 177, 179, [4th Dept. 1977]) [citation omitted]; accord Abrams v Donati, 66 NY2d at 953. The rule applies equally to closely held corporations as to large, publicly traded corporations (see Wolf v Rand, 258 AD2d 401, 403 [1st Dept. 1999]). A shareholder always has standing to sue for harm to the corporation, as long as the suit is brought derivatively, with any recovery going to the corporation (see NY Bus. Corp. Law § 626[a]). Since, as stated previously, the plaintiff has failed to properly plead this cause of action, and since it is duplicative in any event to the cause of action under which she is already entitled to recover, this cause of action will be dismissed.
The Court has reviewed the balance of the plaintiff's causes of action, inter alia, indemnification and punitive damages, and finds that they are without merit, and are therefore dismissed.
CONCLUSION
By reason of the foregoing, the Court renders its decision in favor of the plaintiff, in the sum of $46,000, the amount of her investment, with interest from January 1, 2012 (approximately when defendant Kim began working full-time as a day trader, thereby abandoning the parties' enterprise).
The evidence adduced at the trial showed that defendant Kim never intended to honor his obligations to the music school. He set-up the corporation, and then abandoned the music school to have the plaintiff, or his mother and sister, run the business. His actions evidence a gross disregard for the business. He misappropriated and co-mingled [*12]funds, maintained little or no financial records, operated the school in a careless manner, all without regard to his status as Chief Financial Officer of the corporation. As a result, the business faltered, and the plaintiff lost her money. This Court finds defendant Kim liable for his negligence and hereby orders that the plaintiff's personal contribution of $46,000 to the music school be refunded. 
Accordingly, based upon the foregoing, it is,
ORDERED, that the plaintiff is entitled to recover on her cause of action for breach of fiduciary duty against SHIH & KIM CORPORATION or JI YONG KIM, jointly and/or severally, in the total sum of $46,000, plus interest from January 1, 2012; and it is further
This constitutes the decision and order of the Court.
Dated: March 2, 2017
TIMOTHY J. DUFFICY, J.S.C.



Footnotes

Footnote 1:It was dissolved by proclamation/ annulment of authority on June 29, 2016.

Footnote 2:Proprietary trading occurs when a firm or bank invests for its own direct gain instead of earning commission dollars by trading on behalf of its clients (see http://www.investopedia.com/terms/p/proprietarytrading.asp#ixzz4ZY59pXSI ).